2013 VT 116



State v. Johnson (2012-303)

 

2013 VT 116

 

[Filed 27-Nov-2013]

 

NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.

 

 


 2013 VT 116
 
  


 No. 2012-303
 
  


 State of Vermont
 
 
 Supreme Court
 
 
  
 
 
  
 
 
  
 
 
 On Appeal from
 
 
      v.
 
 
 Superior Court, Washington
 Unit,
 
 
  
 
 
 Criminal Division
 
 
  
 
 
  
 
 
 Edward M. Johnson
 
 
 October Term, 2013
 
 
  
 
 
  
 
 
  
 Howard E. Van Benthuysen, J. (motion
 for mistrial); Michael S. Kupersmith, J. (final judgment)
  
 
 William H. Sorrell, Attorney
General, and David Tartter, Assistant Attorney General,

  Montpelier, for Plaintiff-Appellee.

 

Allison N. Fulcher of Martin & Associates, Barre, for
Defendant-Appellant.

 

 

PRESENT:   Reiber, C.J., Dooley, Skoglund and Robinson,
JJ., and Crawford, Supr. J.,

     
              
Specially Assigned

 

 

¶ 1.            
REIBER, C.J.   Defendant Edward Johnson appeals his
convictions for attempted aggravated murder, kidnapping, lewd and lascivious
conduct, unlawful trespass, and enhancement under Vermont’s habitual offender
statute, following a jury trial held in the Washington Superior Court.  On
appeal, he argues that 1) the trial court committed reversible error in
refusing to grant a mistrial when a member of the jury pool mentioned, in front
of prospective jurors, that defendant had another case, and 2) that the
evidence was insufficient to prove defendant’s identity as the perpetrator and
that he had the requisite intent to kill.  For the reasons that follow, we
affirm defendant’s convictions. 

¶ 2.            
The procedural history is as follows.  Defendant was charged under
multiple Vermont criminal statutes for entering the victim’s home, forcing her
to participate in sexual acts, restraining her by tying her hands and feet,
strangling her, and then attempting to kill her by stabbing her in the
neck.  

¶ 3.            
During the jury draw, when members of the jury panel were asked if they
knew anything about the case, one member stated, “Yes, what I read about this
case and a prior one of this gentleman.”  Upon further inquiry, the
potential juror stated, “[T]his case I would be fine with.  I just¾I just know of his other case, so it makes
me weary of this case.”[1] 
Defendant subsequently moved for a mistrial on the basis that the potential
juror’s comments had “infected the whole panel.”    

¶ 4.            
The court denied the motion for mistrial.  It discussed the
possibility of a cautionary instruction that the jury not give consideration to
the reference to some other event involving defendant, and to remind the jurors
they would not know whether the other case was in civil, traffic, family or
criminal court.  Defendant declined the limiting instruction on the
grounds that it would unduly emphasize the juror’s comment by giving “credence
to whatever it was coming out of [the juror’s] mouth.”  Accordingly, the
court did not give the jury the specific proposed instruction.  It did,
however, instruct the following: “Remember that your duty as judges of the
facts is to decide this case based on the evidence that comes to you during the
trial and during the trial only, the sworn testimony and the exhibits which are
admitted.”   

¶ 5.            
A four-day trial commenced on April 16, 2012.  Defendant’s
former girlfriend was living at the victim’s house, along with the victim’s
son.  The ex-girlfriend and the victim’s son both testified that they had
encountered defendant at the victim’s apartment before the incident. 

¶ 6.            
According to the ex-girlfriend’s testimony, on the afternoon of the
incident, the ex-girlfriend, the victim’s son and the son’s daughter walked to
the Burger King in Barre, leaving the victim alone in the apartment.
 Defendant approached the ex-girlfriend in his car and asked her when she
would be coming to his place to get her belongings.  At the time, he was
wearing a black and gray South Pole hoodie.  The ex-girlfriend did not
respond, and defendant drove away.[2] 
When the three of them returned to the apartment, the door was locked. 
After checking a nearby store to see if the victim was buying cigarettes, they
saw an ambulance go by.  They went back to the apartment and found the
victim sitting in the kitchen, holding a sweatshirt to her neck and being
attended by EMTs.  

¶ 7.            
The victim testified that she was laying down on her bed when a black
man wearing jeans and a black hoodie entered her room, jumped on her,
sucked on her breast, and instructed her to take off her clothes.  He
tried to have sex with her but did not have an erection.  He then asked
her to give him oral sex, at which point the victim’s son knocked on the door.
 The man “panicked,” searched for a way to leave the apartment, and,
when unsuccessful, tied the victim’s hands and legs with clothing and began
strangling her.  The victim, however, was able to remove the
restraints.  When she turned around, the man had a knife with a blade six
or seven inches long, and stabbed her in the neck.  When she asked him why
he had done that, he apologized and stabbed her a second time in the neck, this
time twisting the knife.  He then left, stating that he would be back “to
finish the job.”  The victim called an ambulance and used a piece of cloth
to cover the wound.  The victim was unable to identify the perpetrator at
the scene.  She stated at the time that she did not believe the
perpetrator could be defendant, because she believed that the man who attacked
her was in his twenties.  

¶ 8.            
Among other witnesses present at the scene, the EMT testified that he
responded to the victim’s call and transported her to the hospital.  He
described the victim’s neck wound, which was about two inches long,
three-quarters of an inch at its widest, and exposed her trachea.  The
wound ultimately required ten stitches.  A neighbor also testified, stating
that he had seen a man come out of the victim’s house after the incident. 
The neighbor had also seen the man trying to open the door to the house several
weeks before.  The neighbor unequivocally identified defendant as the man
in a photographic line-up.  

¶ 9.            
A detective with the Barre City Police Department spoke with
defendant.  The detective asked defendant if he knew why he was being
questioned, and he answered that he had heard there was a rape in Barre. 
Defendant stated that on the afternoon in question, he went to a beverage store
and a grocery store, and then stayed at his friend’s house in Montpelier until
10 p.m., after which he returned home.  Defendant claimed that he had used
a debit card and taken out cash from the bank in order to pay for his
purchases.  However, an employee of defendant’s bank confirmed that
defendant did not withdraw cash or make a purchase at the grocery store that
day.  Additionally, the friend defendant claimed to have visited in
Montpelier testified that defendant asked her to lie for him if she was
questioned by police.  The friend had initially submitted a written
statement to police stating that defendant was with her between 4:30 p.m. to 1
a.m. that day, but later admitted to the police that she had lied. 

¶ 10.        
Several DNA analysts testified regarding the physical evidence at the
scene of the crime.  A DNA analyst at the Vermont Forensic Laboratory
testified that a mixture of DNA from three people was obtained from the
victim’s bra, and that he could not exclude either the victim or defendant from
the sample.  A forensic DNA examiner employed by the FBI Laboratory
testified that she analyzed a hair found in the victim’s bedding and
determined, based on mitochondrial testing, that she could exclude the victim,
but not the defendant, as the source of the hair.  According to her
testimony, the DNA sequence found in both the hair from the victim’s bedding
and the sample from defendant is present in not more than .74 percent of the
African-American population.  A second FBI analyst, who specializes in the
examination and comparison of hairs, fiber, and fabrics, testified that,
because of the sample’s limited value for comparison purposes, no conclusion
could be reached as to whether the hair belonged to defendant. 

¶ 11.        
The State rested on the fourth day of trial.  Defendant did not
present any witnesses or immediately move for a judgment of acquittal at the
close of evidence.  The court excused the jury, and after a short recess,
began the charge conference by stating, “before we get into [the jury
instructions], I didn’t give you the chance to make your motion, [defendant],
so we should deal with that.”  Defendant then moved for dismissal under
Vermont Rule of Criminal Procedure 29, arguing that there was insufficient
evidence to support the penetration element of sexual assault, defendant’s
identity as the perpetrator, or the restraint and use of a knife to support the
attempted murder charge.[3] 
The court denied the motion, noting that 

[A]s
far as the sexual assault issue is concerned, as [the State] pointed out, it’s
sufficient if the State proves there’s contact between defendant's penis and
the victim’s vulva, and [the victim] testified to such contact, so the motion
regarding the sexual assault is denied.  And I believe there is sufficient
evidence for¾to prove identity.
 The testimony of [the neighbor] that he saw defendant leaving the
premises at a time that coincides with the assault, the DNA evidence, although
not definitive, is certainly strong evidence that it was [defendant].  And
I think as important as anything is the testimony regarding the effort of the
defendant to establish a false alibi.  So I believe there is sufficient
evidence that [defendant] committed these offenses and the motion of judgment
of acquittal is
denied.                      


 

¶ 12.        
As part of the jury instructions, the judge reminded the jurors that
they could not decide the case “on anything but the evidence received in the
courtroom in this case,” and that “[y]ou must not tell your fellow jurors about
matters which are based on special knowledge concerning an issue in the case on
trial which did not come from the evidence
received in the courtroom in this case.”  The jury returned a
verdict of not guilty for sexual assault, and guilty for attempted aggravated
murder, kidnapping, lewd and lascivious conduct, and unlawful trespass. 
Subsequently, the jury found that defendant was a habitual offender for having
three or more prior felonies.  Defendant was sentenced to life without
parole for the attempted murder, and to concurrent sentences of twenty-five
years to life under the habitual offender statute, 13 V.S.A. § 11, for
each of the kidnapping, lewd and lascivious conduct and unlawful trespass
convictions.  This appeal followed.

I.

¶ 13.        
Defendant first argues that the trial court erred in denying defendant’s
motion for a mistrial after a potential juror stated to the panel that she knew
that defendant was involved in another case.  Generally, deciding a motion
for a mistrial is entrusted to the discretion of the trial court, and we will
not disturb the trial court’s ruling unless it has abused that
discretion.  State v. Grega, 168 Vt. 363, 370, 721 A.2d 445, 451
(1998); see also State v. McKeen, 165 Vt. 469, 472, 685 A.2d 1090, 1092
(1996).  “Because the trial judge develops a
relationship with the jury during the course of trial, he or she is in the best
position [to determine whether
the jury has been tainted]. Consequently, every reasonable presumption
in its favor is accorded to the ruling below.”  McKeen, 165 Vt. at
472, 685 A.2d at 1092-93 (citation omitted).

¶ 14.        
Criminal defendants have a constitutional right to trial by an impartial
jury.  U.S. Const. amend. VI (“In all criminal prosecutions, the accused
shall enjoy the right to a speedy and public trial by an impartial
jury . . . .”); Vt. Const. ch. I, art. 10 (“[I]n all
prosecutions for criminal offenses, a person hath a right to . . . a
speedy public trial by an impartial jury . . . .”). 
This right is coterminous under the United States and Vermont
Constitutions.  State v. Pelican, 154 Vt. 496, 508-09, 580 A.2d
942, 950 (1990).  

¶ 15.        
In order to be impartial, the jury must be free of the taint of extraneous
influences.  State v. Wool, 162 Vt. 342, 353, 648 A.2d 655, 662
(1994); State v. Woodard, 134 Vt. 154, 156, 353 A.2d 321, 323
(1976).  “Determining whether a verdict was
affected by extraneous influences is a fact-driven exercise that turns on the
particular facts and circumstances of each case.”  State v. Gorbea,
169 Vt. 57, 60, 726 A.2d 68, 70 (1999) (quotation omitted).  To
prevail on a claim of extraneous influence, defendant must demonstrate (1)
that the irregularity occurred; and (2) that the irregularity had the capacity
to affect the jury’s verdict.  State v. Lee, 185 Vt. 110, 120, 967
A.2d 1161, 1169 (2008).  As to the first prong, “anything creating a
suspicion of extraneous influences” may constitute an irregularity.  State
v. Griffin, 152 Vt. 41, 45, 563 A.2d 642, 645 (1989).  For the second
prong, a party claiming taint need not show that the irregularity actually
influenced the result, but merely that it had the capacity to do so.  Id.;
see also Woodard, 134 Vt. at 157, 353 A.2d at 323 (“All that [must] be shown was that [the] circumstances could
have had the capacity to influence the deliberation and verdict of the
jury.”).  If defendant demonstrates these two elements, the burden
shifts to the State to show the absence of prejudice.  State v. Squiers,
2006 VT 26, ¶ 21, 179 Vt. 388, 896 A.2d 80.  The stringency of the rule
regarding taint “is grounded upon
the necessity of keeping
the administration of justice pure and free from all suspicion of corrupting
practices.”  Woodard, 134 Vt. at 156-57, 353 A.2d at 323 (quotation
omitted); see also State v. Ovitt, 126 Vt. 320, 324-25, 229 A.2d 237,
240 (1967) (“When dealing with the integrity of the jury [the defendant] has
only to show the existence of circumstances capable of prejudicing the
deliberate function of the jury. He is not required to prove that they actually
did so.” (quotation omitted)).

¶ 16.        
In the instant case, defendant claims that a potential juror’s statement
during voir dire about defendant’s other case irredeemably tainted the jury
pool and necessitated a mistrial.  We hold that the trial court did not
abuse its discretion in denying defendant’s motion for a mistrial. 

¶ 17.        
The potential juror’s comment undeniably constituted an irregularity
because it introduced extraneous information regarding defendant to the jury
panel, and therefore met the first prong of the test.  However, we cannot
agree with defendant that the second prong was met, because the circumstances
here did not show a danger that extraneous influences affected the jury
verdict.  See Woodard, 134 Vt. at 157, 353 A.2d at 323. 
First, the issue was duly brought to the trial court’s attention and curative
action was taken¾the offending juror,
who the parties agreed was unqualified to serve based on her questionnaire and
comments, was dismissed from the panel.[4]  See Squiers, 2006 VT 26,
¶ 22 (holding that when a juror’s legal research was duly brought to the
court’s attention and the court took curative action that there was no capacity
for the error to affect the verdict); cf. Woodard, 134 Vt. at 157, 353
A.2d at 323 (holding that jury was tainted when a juror who overheard
defendant’s phone conversation remained in panel for several hours before
notifying the judge).  

¶ 18.        
Second, the potential juror’s comments were isolated, lacking in detail,
and vague enough so as to bear no relevance on the issues in the case at
hand.  Although the potential juror mentioned that she was “weary” that
defendant had “another case,” she did not go into any detail about the facts,
whether it was a criminal or other type of case, or whether there was a
conviction.  This case is a close one, as we have previously, albeit
implicitly, recognized that extraneous factual revelations to the jury may have
greater capacity to impact jury deliberations than extraneous information
concerning only a legal issue.  Squiers, 2006 VT 26, ¶ 22.
  Nevertheless, the potential juror’s statement here was not
sufficiently detailed to have the potential to impact the jury’s
deliberations.  Had the juror provided details regarding the other case or
about the crimes with which defendant was charged here, there would be enough
to potentially influence the jury’s view of defendant and thus prejudice the
outcome.  However, the prospective juror mentioned no specifics, and given
the vagueness of her assertions, which did not specify the type and nature of
the case or the underlying claims, the information was simply not “relevant to
an issue capable of affecting the verdict.”  State v. Abdi, 2012 VT
4, ¶ 13, 191 Vt. 162, 45 A.3d 29.  

¶ 19.        
Finally, the trial court here gave adequate instructions to the
jury.  At the end of voir dire when the jury was finally empanelled
without the potential juror who was dismissed without comment, the court
instructed them that “your duty as judges of the facts is to decide this case
based on the evidence that comes to you during the trial and during the trial
only, the sworn testimony and the exhibits which are admitted.”  After the
conclusion of evidence, the court instructed the jury before they retired to
deliberate that it would be “a violation of your sworn duty as judges of the
facts to base a verdict on anything but the evidence received in the courtroom
in this case,” and that “[y]ou must not tell your fellow jurors about matters
which are based on special knowledge concerning an issue in the case on trial
which did not come from the evidence received in the courtroom in this case.”
 These instructions were sufficiently curative to remove any irregularity
created by the potential juror’s comments.  See Squiers, 2006 VT
26, ¶ 23 (affirming that curative instructions can purge the taint of
extraneous influence).  

¶ 20.        
Furthermore, at voir dire, the defendant declined a more specific
instruction directed to the comments of the prospective juror.  The judge
offered an instruction that would prohibit the jury from considering any other
cases involving defendant, and remind the jurors that they did not know whether
defendant’s other case was in civil, traffic, family or criminal court. 
Defendant, however, refused the offer of a limiting instruction on the grounds
that it might lend credibility to the juror’s statements.  It was
defendant’s prerogative to make this tactical decision, but the general
instructions were sufficient to neutralize any capacity for the comment to
influence the verdict.  See Lee, 2008 VT
128, ¶ 24 (noting that it may be appropriate for the court to avoid “action [that]
might have had the effect of unnecessarily highlighting the issue where
defendant made no showing of special prejudice and the likelihood of unfair
prejudice was small”).  

¶ 21.        
Under these circumstances, defendant cannot prove a prima facie case of
extraneous influence, because he cannot demonstrate that the irregularity
during voir dire had any capacity to influence the jury’s deliberations. 
Thus, the trial court did not abuse its discretion by refusing to grant a
mistrial on that basis.

II.

¶ 22.        
Defendant next argues that the evidence presented at trial was
insufficient to sustain his convictions.  Specifically, defendant argues
that the evidence was insufficient to prove his identity as the perpetrator or
that he intended to kill the victim.  

¶ 23.        
As an initial matter, we address the standard of review.  The State
argues that because defendant did not technically move for judgment of
acquittal under V.R.Cr.P. 29 at the close of the State’s case, waiting instead
until the charge conference, defendant’s claim was not timely and therefore
should be reviewed for plain error only.  Defendant responds that it was
court error that caused the delay, and so it would be unfair to penalize
defendant.  

¶ 24.        
Rule 29 provides that a defendant may move for a judgment of acquittal
either “at the close of evidence” before submission of the case to the jury,
V.R.Cr.P. 29(a), or within 10 days after the jury is discharged, V.R.Cr.P.
29(c).  Although it is true that defendant did not move for acquittal at
the precise moment of the close of evidence, we reject the State’s
hyper-technical reading of Rule 29.  Rather, because defendant did not
present witnesses or put on evidence, the timing of his motion¾after a short recess following the close of
evidence and immediately before the charge conference¾did not alter the course of the proceedings in any way.

¶ 25.        
Moreover, the Rule’s plain language provides for multiple opportunities
for acquittal, and is thus clearly intended to offer defendants flexibility in
challenging the sufficiency of the evidence at trial.  A Rule 29 motion
can be made after the jury is discharged, even if “a similar motion [was not]
made prior to the submission of the case to the jury,” V.R.Cr.P. 29(c), or even
on the court’s own motion, V.R.Cr.P. 29(a).  In fact, the current rule
departs from prior versions by expressly not requiring a pre-verdict motion as
a prerequisite to a post-verdict motion.  Reporter’s Notes, V.R.Cr.P. 29;
see also State v. Brooks, 163 Vt. 245, 254,
658 A.2d 22, 28 (1995) (allowing defendant to move for acquittal post-verdict
regardless of whether there was a pre-verdict motion, and expressly overruling
prior case law that held to the contrary).  This trend towards
liberalizing Rule 29 accords with its purpose to “protect[] against an improper
or irrational verdict of the jury,” United States v. Tisor, 96 F.3d 370,
379-80 (9th Cir. 1996) (quotation omitted) (discussing analogous federal rule),
and to preserve the presumption of innocence accorded to criminal
defendants.  See Coffin
v. United States, 156
U.S. 432, 453 (1895) (“The principle that
there is a presumption of innocence in favor of the accused is the undoubted
law, axiomatic and elementary, and its enforcement lies at the foundation of
the administration of our criminal law.”).  Accordingly, we review the Rule 29 motion as properly
preserved.    

¶ 26.        
In reviewing a Rule 29 sufficiency of the evidence claim, “we must
consider whether the evidence, when viewed in the light most favorable to the
State and excluding any modifying evidence, fairly and reasonably tends to
convince a reasonable trier of fact that the defendant is guilty beyond a
reasonable doubt.”  State v. Muscari, 174 Vt. 101, 105, 807 A.2d
407, 411 (2002) (quotation omitted); see also State v. Desautels, 2006
VT 84, ¶ 7, 180 Vt. 189, 908 A.2d 463.  A judgment of acquittal is
proper only if the prosecution has failed to put forth any evidence to
substantiate a jury verdict.  State v. Couture, 169 Vt. 222, 226,
734 A.2d 524, 527 (1999).    

¶ 27.        
As to his identity claim, defendant questions the victim’s
identification of defendant as the perpetrator based on her inability to identify
him at the scene of the crime; the ex-girlfriend’s testimony that defendant
drove towards the victim’s house after their encounter in Barre; the neighbor’s
testimony placing defendant at the scene of the crime; the implication of guilt
from defendant’s request that his friend lie for him; and the usefulness of the
DNA evidence.  With these arguments, defendant rehashes the
inconsistencies in the evidence and the credibility of witnesses put forth at
trial.  However, these issues were already resolved by the jury in favor
of the State.  We are not triers of fact, and we will not substitute our
judgment for that of the jury.  See State v. Norton, 134 Vt. 100,
103, 353 A.2d 324, 326 (1976) (“The
credibility of the witnesses and the weight to be given their testimony is the
sole province of the jury.”).  

¶ 28.        
The jury considered direct and circumstantial evidence regarding
defendant’s identity.  The jury heard from several eyewitnesses at the
scene of the crime, including the victim and her family, defendant’s
ex-girlfriend, and EMT workers, who provided details of the circumstances
surrounding the attack.  The victim testified that the perpetrator was
wearing a black hoodie, a description matched by several other witnesses who
saw defendant on the day of the incident.  The jury heard from the
victim’s neighbor, who had seen him at the victim’s house several times in the
past and who placed him directly at the scene of the crime.  The jury
heard of defendant’s connection to the victim through his former
girlfriend.  Further, the jury heard evidence that defendant had asked a
friend to lie for him about his whereabouts that day, and that defendant’s
alibi that he had gone to the bank and the grocery store was not supported by
any verifiable financial transactions.  Finally, the jury heard from
several analysts that the DNA evidence at the crime was consistent with
defendant’s DNA, although it did not definitively prove that he was the
perpetrator.  This evidence was sufficient for a jury to find that defendant
was the perpetrator.

¶ 29.        
As to the intent claim, defendant argues he could not have intended to
kill the victim because, at the time of the assault, he stated that he would
kill the victim later.[5] 
There are two elements to Vermont’s attempt statute, 13 V.S.A. § 9: 1)
intent to commit a crime, and 2) “an overt act designed to carry out that
intent.”  State v. Synnott, 2005 VT 19, ¶ 22, 178 Vt. 66, 872
A.2d 874 (quotation omitted).  Here, the issue is whether defendant’s act
of stabbing the victim twice in the throat constitutes attempt, given the words
defendant said to victim and the surrounding circumstances.  We hold that
it does, for two reasons.  First, a reasonable jury could find that the
victim’s neck injury¾a two-inch
laceration that exposed her trachea and required ten stitches¾was sufficiently serious as to prove
specific intent to kill, regardless of what the perpetrator said at the
time.  See State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255
(1988) (“Intent is rarely proved by direct evidence;
it must be inferred from a person’s acts and proved by circumstantial
evidence.”); see also State v. Devac, no. 2010-458, 2010 WL 7773466 at * 2 (Vt. Dec. 20, 2010) (unpub. mem.),
https://www.vermontjudiciary.org/UPEO2006-2010/eo10-458.bail.pdf (affirming
trial court’s decision to deny defendant bail based on great evidence of guilt,
and noting that “the intent to kill can be inferred from the evidence of
defendant’s use of a deadly weapon in a lethal manner—that is, stabbing the
victim with a knife in a vital area of the body”); State v. Tomasko,
681 A.2d 922, 927 (Conn. 1996) (holding in
case where defendant shot victim during an argument that “[o]ne who uses a deadly weapon upon a vital part of another
will be deemed to have intended the probable result of that act, and from such
a circumstance a proper inference may be drawn in some cases that there was an
intent to kill” (quotation omitted)).  

¶ 30.        
Second, a jury could reasonably interpret defendant’s words that he
would be back “to finish the job” to mean that, because he had not succeeded in
killing the victim during the encounter, he would be back later to consummate
the act.  See Cole, 150 Vt. at 456, 554 A.2d at 255.  In
short, defendant’s words and actions provided ample evidence for a jury to
infer the intent to kill.  

¶ 31.        
Further, defendant’s decision to leave the scene before he succeeded in
killing the victim does not negate his specific intent to kill.  First,
defendant was not thwarted by impossibility.  Cf. State v. Devoid,
2010 VT 86, ¶¶ 11-17, 14, 188 Vt. 445, 8 A.3d
1076 (reversing attempted voyeurism conviction because it was physically
impossible for the defendant to have seen the victim’s intimate areas from the
position where he was standing, so that the act would “not be likely to end in
the consummation of the crime intended” (quotation omitted)).  A
reasonable jury could infer that, regardless of the fact that defendant fled
the scene, the wound already inflicted was sufficiently serious to constitute
“[a]n overt act” that had gone “beyond mere intent and reach[ed] far enough
toward accomplishing the desired result to amount to the commencement of the
consummation.”  Id. ¶ 11.  Second, even if defendant’s
actions could be seen as abandonment, abandonment is no defense to an attempt
once the overt act has been committed.  Synnott, 2005 VT 19,
¶ 22 (“[O]nce the actor has committed the requisite overt act, the offense
is complete, and abandonment of the enterprise does not negate guilt.”).  

¶ 32.        
For these reasons, we hold that there was sufficient evidence to support
defendant’s convictions.

Affirmed.

 


  
 
 
  
 
 
 FOR THE
 COURT:
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
  
 
 
 Chief Justice
 
  











[1]
 Although the court subsequently indicated that the potential juror would
be removed from the panel, the juror was asked further questions before she was
finally removed.  





[2] 
The ex-girlfriend claims that defendant drove in the direction of her
apartment, while defendant claims he drove in the opposite direction, towards
Montpelier. 





[3] 
Defendant’s claims as to the restraint and use of a knife were ultimately not
included in his Rule 29 motion after the court asked for additional
clarification.  





[4]
 Defendant contends that the court seated the potential juror for voir
dire by mistake, after the parties had agreed based on the questionnaire that
the juror should not be allowed to sit.  We do not assess whether the
court erred in this regard, but even if it had, this error does not affect our
holding because the juror’s comments did not taint the panel in any event. 





[5]  The State argues we should review for
plain error defendant’s claim of insufficient evidence of intent, because it
was not adequately raised during his motion for acquittal and thus not
preserved for appeal.  We need not address the standard of review because
we find sufficient evidence of intent.  Therefore, the outcome would be
the same under either standard.