Reiber, CJ.
¶ 1. This is an attempted murder case. At trial, defendant theorized that a group of late-night club-goers with whom he was partying conspired to frame him for a stabbing that occurred in downtown Burlington shortly after two o’clock in the morning of January 15, 2012. Defendant argues that the trial court erred by excluding exculpatory testimony and by giving misleading jury instructions regarding reasonable doubt and permissive inferences. We affirm on all issues and uphold defendant’s conviction.
¶ 2. Three important features defined this case at trial. First, there was confusion over who stabbed the victim. This confusion was created by the quickly unfolding nature of the events that led to the stabbing, the number of people at or near the scene of the altercation, the victim’s inability to identify the person who stabbed him, and the incomplete and conflicting recollections of witnesses. Second, due to the lack of physical evidence linking defendant to the stabbing, the State’s case relied principally on the testimony of various witnesses, including the victim, two women who witnessed the stabbing from their nearby parked car, three members of the group of club-goers, defendant’s former girlfriend, defendant’s surrogate mother, a trauma surgeon who treated the victim, and several Burlington Police Department officers who responded to or investigated the crime. Third, as noted, defendant’s primary theory at trial was that the group of friends he was with at the scene conspired to frame him to protect the actual perpetrator among them. He emphasizes that members of the group did not implicate him in the crime until after they were initially inter-viewed by police.
*463 ¶ 3. The jury was tasked with piecing together multiple witnesses’ testimony — much of which was incomplete or conflicting — into a coherent picture of what occurred that night. The following rendition of the facts is drawn from that testimony. On the night of January 14, 2012, defendant met his former girlfriend, Sarah Giles, at a pool hall in downtown Burlington. Giles and defendant had dated from the end of October 2011 until shortly before the New Year, and had lived together at Giles' apartment for part of that period. They met that night contemplating getting back together again, and they engaged in hugging and kissing at the pool hall. Giles informed defendant that she planned to go to a local nightclub later with their mutual friend, Jess Sturtevant, with whom defendant had grown up.
¶ 4. Giles and Sturtevant arrived at the nightclub at approximately ten-thirty in the evening and encountered Shaun Couture, Chad Limoge, Jess Cornell, and Hannah Yurie. Giles had known Cornell and Yurie since high school, but did not know Couture and was only tangentially aware of Limoge, who was Couture’s cousin and Cornell’s boyfriend. Defendant arrived at the club with two of his friends about an hour after Giles and Sturtevant had gotten there. Defendant and Giles continued to interact romantically at the club.
¶ 5. Several minutes past two in the morning after the club closed, defendant, Giles, Sturtevant, Cornell, Yurie, Couture, and Limoge went outside to get pizza at a next-door pizzeria. While they were outside, another man, Eric Hazen, who had been at the club and who Giles knew from high school, engaged defendant and Giles in a conversation. As the group waited for pizza, Cornell began yelling that she had been grabbed or punched by the victim, a stranger who was passing by on the sidewalk. Couture and Limoge confronted the victim, and an argument ensued. There was testimony from some members of the group, which was contradicted by the victim, that the victim attempted to punch Limoge but inadvertently struck Cornell instead. At that point, several members of the group — defendant, Couture, Limoge, Hazen, and Yurie — began pursuing the retreating victim to the end of the block. Giles testified that she yelled at defendant to come back, and that he did so initially but turned around again to join the others in pursuit of the victim.
¶ 6. The exact details of the stabbing itself are even less clear. The victim testified that he was followed around a corner by two *464 men from the group, and when those two men confronted him, he squared up to fight. Although the victim did not remember much about the perpetrator’s appearance, he recalled that one of the men, the taller of the two, lunged in towards him. The victim testified: “I just felt like a punch in my stomach, and then I knelt down . . . trying to catch my breath. And then I felt it was like wetness, and then I saw blood going down and I was like, ‘Fuck, you fucking stabbed me.’ ”
¶ 7. Couture testified that defendant had stabbed the victim. According to Couture, he followed the victim down the street from where the altercation started and around the corner, at which point defendant ran past him and appeared to punch the victim in the stomach before running away. Two women who were in a parked car near where the stabbing took place testified as to what occurred and described the assailant. The woman with the clearer recollection of the altercation testified that the victim — a black man — came around the corner while being followed by two white men. According to the witness, after the victim said something like “I ain’t got your shit,” the taller of the two men leaned in and made a swiping motion toward the victim’s midsection, after which both white men ran off, heading in different directions once they reached the corner from which they had come.
¶ 8. Within seconds of being stabbed, the victim flagged down a police cruiser. Shortly thereafter, other police officers in the area encountered Couture, Limoge, and Yurie. At some point, Giles contacted defendant, who had gone to the nearby apartment of his friend, Chad Ely, the son of Emma Ely, who testified that defendant had been a close part of her family since he was five years old. Giles, Sturtevant, and Cornell then went to Ely’s apartment to join defendant. The three women remained at the apartment for about half an hour, until Sturtevant was able to get hold of Yurie, at which point the women went to the Burlington police station to be interviewed. In the early morning hours of January 15, the police interviewed Couture, Limoge, Yurie, Giles, Sturtevant, and Cornell, none of whom mentioned defendant’s presence at or involvement in the altercation.
¶ 9. After the interviews, Giles, Sturtevant, Couture, and Limoge left the police station together in Giles’s car. There was conflicting testimony as to how it transpired, but during the ride Couture told Limoge, who in turn told the women, that Giles’s boyfriend had stabbed the victim. Couture reported that to the police the *465 next day. Meanwhile, Giles contacted defendant through Facebook and told him that people were saying he had stabbed the victim. When defendant responded to her message later that morning, Giles asked defendant what had happened the previous night, and he told her that they could talk about it later. Giles testified that she met defendant later that day, at which time he admitted to her that he had stabbed the victim because he thought the victim had struck Sturtevant. Giles further testified that she encouraged defendant to turn himself in to police, but when he later denied being the assailant in another Facebook exchange with her, she went to the police on January 17 and told them defendant had admitted stabbing the victim. Giles agreed to meet with defendant wearing a body wire, but during their recorded conversation he did not admit to stabbing the victim. Defendant was arrested and charged with attempted second-degree murder.
¶ 10. At trial, defendant’s primary theory was that the group of party-goers conspired to frame him to protect the actual perpetrator among them. Apparently unconvinced by this theory, the jury returned a guilty verdict, and defendant was sentenced to twenty years to life, all suspended except for twelve years. On appeal, defendant alleges that the trial court erred by: (1) not allowing a police officer to testify that Limoge telephoned police on the morning of January 15 to report that he had overheard Giles and Sturtevant saying that defendant stabbed the victim; (2) incorrectly instructing the jury on the meaning of reasonable doubt; (3) suggesting in its intent-to-kill instruction that defendant harbored such intent; and (4) not telling the jury that it had to find each basic fact beyond a reasonable doubt in order to infer this intent.
I.
¶ 11. Defendant first argues that the trial court erroneously refused to allow a police officer to testify that Limoge called police not long after he was initially interviewed to report that he had overheard Giles and Sturtevant in the car ride from the police station saying that defendant was the one who had stabbed the victim. Defendant argues that the trial court should not have excluded the testimony as hearsay because it was offered for its falsity rather than its truth. We agree that the trial court erred in excluding the testimony, but conclude that the error was harmless.
*466 ¶ 12. At trial, defense counsel sought to elicit testimony regarding how defendant was identified to police as the person who stabbed the victim. The following exchange occurred during defense counsel’s cross-examination of Giles:
Q: If Mr. Limoge were to say to the police that on the car ride from the police station to the Champlain Farms he had overheard the girls talking about who had done it and that’s . . . how he learned about who did the stabbing, would that be accurate?

A: No.
A similar exchange occurred during defense counsel’s cross-examination of Couture:
Q: If Chad Limoge called the police after you had left the police station, 6:00, 7:00 in the morning, and called the police and said, “He knew it was [defendant] because he overheard the girls talking about it, and they said it was [defendant],” that would be the truth, would it?
A: I don’t know. I know what I said, so.
Q: You didn’t overhear the girls talking, saying, “Hey, we know it’s [defendant] that did this?”
A: No.
¶ 13. Later, on the third day of trial, the following exchange occurred during defense counsel’s examination of the officer who answered Limoge’s telephone call:
Q: Okay. At some point after Mr. Limoge leaves, did you receive a phone call from Mr. Limoge?
A: Yes.

Q: Okay. And did you speak with him?
A: Yes.
Q: And what did he have to say?
At that point, the prosecutor objected on hearsay grounds. Defendant stated that he was not offering the testimony for the truth of the matter asserted but rather for the fact that Limoge made the call and lied to police about Giles and Sturtevant saying that defendant was the assailant. The trial court ruled, however, that the statement was inadmissible as hearsay, and advised *467 defense counsel that he would have to call Limoge as a witness if he wanted the testimony admitted.
¶ 14. The trial court has wide discretion in ruling on the admissibility of evidence. See State v. Noyes, 2015 VT 11, ¶ 13, 198 Vt. 360, 114 A.3d 1156. We will set aside evidentiary rulings only if a defendant shows “that the court’s discretion was either totally withheld or exercised on grounds clearly untenable or unreasonable.” State v. Parker, 149 Vt. 393, 401, 545 A.2d 512, 517 (1988) (quotation omitted). The State argues that, given its wide discretion, the court had a reasonable basis for excluding the officer’s testimony regarding Limoge’s statements and that, even if the court’s ruling was erroneous, it was harmless. State v. Madigan, 2015 VT 59, ¶ 32, 199 Vt. 211, 122 A.3d 517 (“When the admission of evidence, exclusion of evidence, or propriety of argument is objected to in the trial court and raised on appeal, we review for harmless error, determining whether (1) the ruling was erroneous, and (2) if so, whether ‘a substantial right’ of defendant was affected.”).
¶ 15. We conclude that the trial court erred in excluding the proffered testimony on hearsay grounds because the testimony was not offered to prove the truth of the matter asserted. See V.R.E. 801(c) (“‘Hearsay’ is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.”). The testimony was not offered to prove that Limoge heard Giles and Sturtevant talking about defendant being the assailant, but rather the opposite — to suggest that Limoge was lying to police about what he overheard the women saying. This does not constitute hearsay. See United States v. Hathaway, 798 F.2d 902, 905 (6th Cir. 1986) (“[Statements offered to prove the falsity of the matter asserted are not hearsay.”); see also United States v. Brown, 560 F.3d 754, 765 (8th Cir. 2009) (holding that witness’s statement to police “was not introduced for the truth of the matter asserted, but to show that he was lying,” which is not inadmissible hearsay).
¶ 16. Defendant contends that the error was not harmless because it undercut the defense’s primary theory that the close-knit group, particularly Couture, Limoge, and Giles, conspired to falsely accuse him of stabbing the victim. According to defendant, because Limoge’s telephone call to the police was the first time police were told that defendant was the assailant, if he could have *468 shown Limoge was lying about Giles and Sturtevant saying it was him, it would have bolstered his conspiracy theory. Upon review of the record, we conclude that the trial court’s error in not allowing the police officer’s response was harmless.
¶ 17. We will uphold defendant’s conviction if we find that the error was harmless beyond a reasonable doubt. State v. Lipka, 174 Vt. 377, 384, 817 A.2d 27, 33 (2002) (“We can uphold a criminal conviction, despite a confrontation clause error, if we find that the error was harmless beyond a reasonable doubt.”). In conducting this analysis, we do not play the role of factfinder; rather, our focus is on the jury and whether it would have returned a guilty verdict even if the excluded testimony had been admitted. See id. (holding that error is harmless and conviction will be upheld upon determination beyond reasonable doubt that jury would have convicted even if error had not occurred). The two primary components of this determination are weighing (1) the strength of the case against defendant without the excluded evidence, and (2) the strength of the excluded evidence. Id. at 385, 817 A.2d at 34 (“The two most important factors in the harm equation we must employ are the strength of the prosecution’s case without the offending evidence and the strength of the offending evidence.”); see also Coy v. Iowa, 487 U.S. 1012, 1022 (1988) (“[H]armlessness must ... be determined on the basis of the remaining evidence.”).
¶ 18. We first examine the strength of the State’s case. The State’s principal hurdle in this case was identifying defendant as the person who stabbed the victim. Without question, and not surprisingly given the number of witnesses, the inebriated state of several of those witnesses at the time of the altercation, the occurrence of the assault outside at night in limited light, and the rapidity of the events that led to the stabbing, there was conflicting testimony concerning the identity of the assailant. Nevertheless, the State presented substantial evidence identifying defendant as the person who stabbed the victim.
¶ 19. The State presented three eyewitnesses to the stabbing, two of whom were not part of the group that defendant claims framed him. Couture was the eyewitness who was part of the group. He was identified as one of the two persons — the shorter one with a burnt orange or camouflage top — who turned the corner and approached the victim right before the stabbing. Hence, he certainly would have known who stabbed the victim. *469 His testimony is brought into question, however, by defendant’s theory that he lied to protect another member of the group. We will address this theory in more detail later.
¶ 20. As noted, the other two eyewitnesses were not part of the group and defendant has not suggested that they had any reason to lie about what they saw. One of the two women in the car parked nearby to where the assault occurred expressed some uncertainty about the appearance of the assailant, although she thought he was the taller of the two men approaching the victim. The other woman, however, accurately described what Couture was wearing and expressed certainty that the assailant was not him but the taller of the two men, who was around six feet tall, with a scruffy chin, and wearing a blue and green plaid zippered hoodie with a white background. The State presented substantial evidence at trial that defendant was about six feet tall and a couple inches taller than Couture, had a scruffy goatee, and was wearing a button-up blue-and-white plaid flannel shirt that Giles had given him for Christmas in December 2011. The witness who described defendant’s appearance also testified that immediately after the stabbing the two white men retreated to the street from which they had come, with the assailant then heading south and the other man heading north. This testimony was consistent with where Couture was apprehended by police and also the direction defendant would have gone to arrive at Chad Ely’s nearby apartment.
¶21. To be sure, defendant points out that the disinterested eyewitness described the assailant as wearing a hooded sweatshirt with a plaid design and zipper, while other evidence indicated that defendant was wearing a button-up plaid flannel shirt that night. Moreover, defendant elicited testimony from the first officer on the scene that she saw two men running from the direction of the stabbing and that one of them she knew to be Erik Hazen was wearing a plaid sweatshirt. On cross-examination, however, the officer acknowledged that her memory of Hazen’s attire was placed in doubt by the fact that the dispatches that night from her call-in indicated she had described Hazen as wearing a black jacket, which was confirmed by the testimony of other witnesses. Thus, the officer’s testimony does not significantly undermine the testimony of the disinterested eyewitness that the stabber was wearing a plaid top similar in color to what defendant was wearing that night.
*470 ¶ 22. There was also evidence that defendant regularly carried a knife and that he had one on him on the night of the stabbing. Both Giles and Emma Ely testified that defendant regularly carried a knife on him. Giles testified that while dancing with defendant on the night of the assault she felt the knife in his pocket. The State also presented testimony that the police were unable to find defendant’s knife or the shirt he was wearing the night of the assault, despite obtaining warrants and searching various locations. This is consistent with Giles’ testimony that defendant told her that he got rid of the knife.
¶ 23. Moreover, the State presented significant evidence of defendant implicating himself as the stabber. Most notably, Giles testified that defendant told her he was the one who stabbed the victim. Although Giles was unable to obtain — at the urging of police — defendant’s confession while she was wired, defendant did state to others that he had confronted the victim, that the victim punched him, and that he heard someone yell out: “Did you stab him?” Chad Ely’s wife, Amanda Carr, who saw defendant when he came to their apartment after the stabbing, testified that defendant told her he had confronted the victim and got hit. Thus, defendant admitted confronting the victim around the corner and he matched the description of the stabber of the two men who turned the corner to confront the victim.
¶ 24. The State also presented two sets of Facebook exchanges between Giles and defendant. In the first, Giles told defendant that others were saying he was the stabber, and he responded by suggesting they talk about it later. In the second, which occurred after defendant’s alleged admission to Giles and her agreement with police to aid them in obtaining a confession from him, she encouraged him to turn himself in and he denied being the stabber. He asked if he could talk to her in person because “Facebook is not a good thing.” The State elicited testimony from Amanda Carr that she participated in the second Facebook conversation he had with Giles and she warned him not to meet with Giles because Giles was setting him up — which could explain why later during the wired conversation Giles was unable to get defendant to repeat his admission to having stabbed the victim.
¶ 25. As for the strength of Giles’s testimony that defendant admitted to her that he was the person who stabbed the victim, there was very little evidence to bolster defendant’s theory that *471 she was part of a conspiracy to frame him. Indeed, both Giles and Emma Ely, defendant’s surrogate mother, testified that defendant and Giles were contemplating getting back together and acted as such the night of the stabbing. There is no evidence suggesting that they had a falling out that night. Defense counsel tried to elicit testimony from Giles that she was “pissed” at defendant that night, but redirect examination revealed that her prior deposition testimony was that she was “pissed” at seeing defendant’s former girlfriend staring at them from the bar — nothing more. Following the stabbing, Giles went to Chad Ely’s apartment to see defendant. She did not seek to distance herself from him until his alleged admission to her that he was the stabber and his reluctance to turn himself in.
¶ 26. Regarding any inclination Giles might have had to frame defendant to protect someone else, there was no evidence as to whom she was allegedly protecting. The most logical beneficiary of any conspiracy to frame defendant would have been Limoge, who was very close to Couture and was one of the persons who followed the victim down the street after the victim allegedly groped or struck his girlfriend. As noted, however, Giles testified that she did not even know Couture until the night of the incident and was only tangentially aware of Limoge, who was the boyfriend of her friend, Cornell. Moreover, the State played a recording from a video camera located at the pizzeria showing Limoge returning to the pizzeria within approximately thirty-five seconds of the start of the scuffle — indicating that it was highly unlikely Limoge had time to run down the street, confront and stab the victim, and then return to the pizzeria. Hazen was also a potential suspect, but the only evidence to support a conspiracy theory to protect him was that he was a friend of Couture and had gone to the same high school a year behind Giles. Furthermore, neither the physical appearance nor the attire of either Hazen or Limoge fit the principal eyewitness’s description of the assailant. All and all, despite inconsistencies in the testimony of the various witnesses as to what occurred on the night of the stabbing, defendant’s conspiracy theory was weak and the State presented a relatively strong case identifying defendant as the assailant.
¶ 27. In discussing the strength of the State’s case, the dissent correctly states that “[t]he record reflects extensive contact and communication among the various witnesses after their initial *472 police interviews corresponding to a developing collective sentiment that defendant, and not the others, should be held accountable for the stabbing.” Post, ¶ 90. The record also reflects that none of that contact or communication reveals any kind of conspiracy to frame defendant. Rather, it reflects the witnesses’ determination not to take the fall for defendant’s actions. For the most part, that evidence was presented by the State and was favorable to the State’s case.
¶ 28. We now examine the strength of the excluded evidence. In doing so, we also consider “the extent to which the offending evidence was inculpatory, whether it was cumulative or duplicative of other evidence, and how prominent it was at trial.” State v. Groce, 2014 VT 122, ¶ 19, 198 Vt. 74, 111 A.3d 1273 (quotation omitted). The excluded evidence was a police officer’s testimony confirming that Limoge called the police station later the same morning that the members of the group were first interviewed and informed police that he overheard Giles and Sturtevant talking in the car ride from the police station about defendant being the person who had stabbed the victim. Defendant argues on appeal that if he had been allowed to prove that the first accusation against him was fraudulent, it would have bolstered his theory that the later accusations by Couture and Giles were also fraudulent.
¶ 29. The logic behind this reasoning is not apparent. It is undisputed that the question of the stabber’s identity arose during the car ride from the police station. Couture testified that at some point he told Limoge that the stabber was the guy whom Giles had been with that evening. He also testified that Limoge may have then told Giles and Sturtevant who the stabber was, but he was not sure. Giles testified that after Limoge spoke to Couture he informed her that the guy she had been with was the stabber. It is unclear why Limoge would have told the police that he overheard Giles and Sturtevant saying that defendant was the stabber — perhaps because at that point Couture and Limoge were considered suspects in the stabbing — and it is also unclear why the jury would have considered this excluded testimony to be exculpatory with respect to defendant. One would think that if members of the group were conspiring to falsely name defendant as the stabber, they would have gotten their stories straight.
¶ 80. The excluded testimony did not go to the ultimate issue of defendant’s guilt or innocence, but rather was intended to strike *473 at the credibility of those group members who testified against defendant, thereby contributing to defendant’s theory that he had been framed by the group. Cf. id. ¶ 22 (stating that erroneously admitted testimony was “highly prejudicial” and “inculpatory because it went directly to the ultimate issue of defendant’s guilt — it was not peripheral, but rather went to the very heart of the State’s case”). This case was not a swearing contest between a complainant and a defendant, however. As indicated above, there was substantial additional inculpatory evidence from multiple witnesses pointing to defendant, and the excluded testimony directly attacked the credibility of a nonwitness, not a complainant. Cf. id. ¶ 21 (noting that “only defendant and complainant testified as to what happened during the alleged sexual encounter”); see also State v. Herring, 2010 VT 106, ¶ 13, 189 Vt. 211, 19 A.3d 81 (refusing to find harmless error and stating that right to confront witnesses and impeach their credibility “is most important when the prosecution’s case . . . essentially depends upon the credibility of a single witness”); State v. Hazelton, 2006 VT 121, ¶¶ 20-21, 181 Vt. 118, 915 A.2d 224 (refusing to find harmless error where case was swearing contest between complainant and defendant, and trial court erroneously allowed two witnesses to recite complainant’s testimony to bolster her credibility); Lipka, 174 Vt. at 385, 817 A.2d at 34 (concluding that seating that prevented defendant from seeing minor witness was not harmless because case presented “a classic swearing contest” to jury). In short, it is difficult to say that the excluded testimony had any real significance.
¶ 31. Moreover, defense counsel informed the jury in his opening statement that there would be conflicting testimony as to when defendant was first identified as the stabber and that Limoge first called police to tell them he overheard Giles and Sturtevant saying that defendant was the stabber. Defense counsel then got both Couture and Giles to concede during their testimony that it would not have been true if Limoge had told police that he overheard Giles and Sturtevant saying that defendant was the stabber. Defense counsel further asked Couture whether Limoge had called the police and given them defendant’s name, to which Couture responded that he may have and that “the police said he called that same day.” This was confirmed by the police officer’s testimony that Limoge did in fact call police after leaving the station and spoke to the officer. Thus, while the jurors could *474 not consider as evidence the defense’s unchallenged claim as to what Limoge said, they knew that he called police shortly after the initial interviews presumably to report something about the stabbing incident.
¶ 32. In sum, given the strength of the State’s evidence of defendant’s guilt and the relative insignificance of the excluded testimony, it is clear beyond a reasonable doubt that the jury would have returned the same guilty verdict even if the trial court had allowed the excluded testimony.
II.
¶ 33. Defendant next argues that the trial court committed structural error by instructing the jury that the term “beyond reasonable doubt” means being convinced with “great certainty.” In explaining reasonable doubt, the court told the jury, in part:
Few things in life are absolutely certain. To say that you believe something beyond a reasonable doubt is to say that you’re convinced of it with great certainty. But proof beyond a reasonable doubt does not require you to be absolutely or 100 percent certain. A reasonable doubt may arise from the evidence or from the lack of evidence.

You must find the Defendant not guilty when you have a reasonable doubt. Even if you believe he is probably guilty. You may find him guilty only if you have no reasonable doubt. You need not be able to articulate or voice an explanation for your doubt. And the doubt that . . . you have as an individual need not be the same doubt held by your fellow jurors. Under no circumstances may a guilty verdict be based upon conjecture or suspicion.
(Emphasis added.)
¶ 34. According to defendant, the court committed reversible error by using the phrase “great certainty” rather than “utmost certainty” — a phrase used by the U.S. Supreme Court in the following sentence in In re Winship, 397 U.S. 358, 364 (1970): “It is also important in our free society that every individual going about his ordinary affairs have confidence that his government *475 cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with utmost certainty.” (emphasis added). We recently rejected an identical argument in State v. Levitt, 2016 VT 60, ¶¶ 5-14, 202 Vt. 193, 148 A.3d 204. We noted that the statement in Winship was “part of the explanation of why due process requires a beyond-a-reasonable-doubt standard of proof in juvenile delinquency cases” and “did not require that the term ‘utmost certainty’ be part of jury instructions.” Id. ¶ 5. After reviewing our precedents and noting that our sister states and the federal courts afforded no “talismanic significance” to the phrase “utmost certainty,” id. ¶¶ 9-12, we concluded there was no error, let alone plain error, in the trial court’s use of the phrase “great certainty.” Id. ¶ 13. In so ruling, we examined the trial court’s reasonable-doubt charge as a whole, noting in particular the court’s emphasis on the defendant’s presumption of innocence and its repeated references to the reasonable doubt standard without attempting to define the term. Id.
¶ 85. Similarly, in this case the trial court emphasized on multiple occasions that defendant was to be presumed innocent, that he had an absolute right to rely on that presumption and was not required to produce witnesses or evidence to prove his innocence, that the State was required to rebut the presumption of innocence by producing evidence of defendant’s guilt beyond a reasonable doubt, that the State had to prove each essential element of the charged offense beyond a reasonable doubt, that any reasonable doubt compelled a not-guilty verdict, that the doubt any individual juror had did not need to be the same doubt held by any other juror, and that under no circumstances could a guilty verdict be based on conjecture or suspicion. Accordingly, there was no error here. As we stated in Levitt, however, we discourage any attempts to explain the term “reasonable doubt,” which we have described as a “hazardous undertaking.” Id. ¶ 14 (quotation omitted).
III.
¶ 86. Defendant next argues that the trial court’s instruction regarding inferring an intent to kill impermissibly suggested to the jury that the evidence proved the assailant’s specific intent to kill. The court gave the following instruction regarding intent:
The second essential element is that the Defendant attempted to kill [the victim] by stabbing him in the *476 abdominal area. An attempt requires both specific intent to commit a particular crime and an open physical act designed to carry out that intent. The State must prove the Defendant acted with a specific intent to kill [the victim]. Specific intent means a decision to act with a conscious objective of accomplishing a certain result; in this case, the killing of [the victim]. The intent with which a person doesn’t act may be shown by the way in which he or she expresses it to others or by his or her conduct.
You may, but are not required, to infer intent to kill from, evidence that a deadly weapon, was used. And from, the manner in which it was used. In considering [defendant’s] intent, you should [weigh] all of the surrounding facts and circumstances established by the evidence to determine whether the State has proved that he intended to kill [the victim].
The State must also prove that the Defendant engaged in at least one open physical act designed to carry out his intent. Threatening words are not enough to be an act. You must distinguish between mere preparation and the actual start of the criminal conduct.
Merely planning the offense or doing some act which might be innocent in itself is not enough. An act is sufficient to be an attempt to commit an offense if it is done intentionally and if it progresses far enough to be the beginning of the crime. The act must be part of a series of events which would lead to the completion of the crime if not interrupted or prevented.
At trial, defense counsel objected to the underlined language, arguing that the court should also have told the jury it could find that defendant merely intended to injure or seriously injure the victim.
¶ 37. We conclude that the court’s instructions on intent, as a whole, properly stated the law to the jury. See State v. Gokey, 136 Vt. 33, 36, 383 A.2d 601, 602 (1978) (“If the charge, taken as a whole and not piecemeal, breathes the true spirit of the law, and if there is no fair ground to say that the jury has been misled, then it ought to stand.”). First, the court accurately charged the *477 jury that defendant had to have had “a specific intent to kill” rather than merely an intent to do the act of stabbing. See State v. Blish, 172 Vt. 265, 272, 776 A.2d 380, 386 (2001) (“[W]e have specifically held that the intent component of voluntary manslaughter is the same as that required for second degree murder — actual intent to kill, intent to do serious bodily injury, or extreme indifference to human life.”). Second, the court stated that the jury may infer intent from the circumstantial evidence presented to it. See State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988) (“Intent is rarely proved by direct evidence; it must be inferred from a person’s acts and proved by circumstantial evidence.”); see also State v. Bacon, 163 Vt. 279, 292, 658 A.2d 54, 63 (1995) (“Although the State must prove the requisite intent of each participant in a felony murder with regard to the murder as well as the underlying felony, the jury may infer such intent from circumstantial evidence”). Third, the court correctly explained “attempt” in the context of attempted murder. The court instructed the jury that it had to find an “open physical act” rather than “[mjerely planning the offense.” State v. Johnson, 2013 VT 116, ¶ 29, 195 Vt. 498, 90 A.3d 874 (“There are two elements to Vermont’s attempt statute ... (1) intent to commit a crime, and (2) an overt act designed to carry out that intent.” (quotation omitted)).
¶ 88. In holding that the instructions properly stated the law, we explicitly reject defendant’s argument that the court erred by telling the jury that it could rely on the use of a deadly weapon, as well as the manner in which it was used, to find intent to kill. On this point, defendant argues that the court improperly intimated to the jury that it should find only an intent to kill, as opposed to an intent to injure defendant. According to defendant, the court should have also instructed the jury that it could find that he was merely intending to injure the victim.
¶ 89. Defendant is correct that because of the deference that jurors may accord to the trial judge, the court may not comment on the evidence in a way that particularly draws attention to the claims of one party. See State v. Camley, 140 Vt. 483, 489, 438 A.2d 1131, 1134 (1981) (“Our Vermont law further restrains a judge from commenting on the evidence in a way which gives undue prominence to any fact, claim or circumstance. This is because a judge’s lightest word or intimation is received by a jury with great deference, and may prove controlling.” (citation omit *478 ted)); see also State v. Brisson, 119 Vt. 48, 53, 117 A.2d 255, 258 (1955) (reversing criminal verdict where “the trial judge attempted to chart the course the jury should follow in search of the truth”). In this case, however, the trial court’s reference to “the manner in which [the knife] was used” does not amount to a comment on the evidence or imply that the court believed that the manner of use showed an intent to kill. Moreover, that part of the instruction to which defendant objects explicitly told the jurors that they were “not required to infer intent to kill.” Hence, defendant’s claim of error is unlike those in cases in which we have found error in a permissive inference instruction. See State v. Vuley, 2018 VT 9, ¶ 1, 193 Vt. 622, 70 A.3d 940 (finding error where jury instruction did not properly explain doctrine of chances and did not instruct jury not to use propensity evidence to determine whether defendant was guilty, both of which were important aspects of trial); Camley, 140 Vt. at 490, 438 A.2d at 1134 (holding that it was reversible error to link “not guilty” option to condition that jury find defendant was acting in self-defense).
IV.
¶ 40. Finally, defendant argues that the trial court committed plain error by instructing the jury that it could infer an intent to kill from evidence that a deadly weapon was used and the manner in which it was used, but failing to instruct the jury that it had to find that the basic facts giving rise to the inference were proven beyond a reasonable doubt. He contends that the court’s instruction did not require the jury to decide whether a lethal weapon was used or whether such a weapon was used in a lethal manner, and did not inform the jury in what manner a weapon could be used to infer an intent to kill. According to defendant, rather than using the vague phrasing “from the manner in which it was used,” the court should have instructed the jury that it would first have to find that the State proved beyond a reasonable doubt that defendant used the knife in a lethal manner. Defendant concedes that he did not object at trial to the permissive inference instruction on these grounds, but contends that the court committed plain error because the error was obvious and prejudicial and affected his due process rights.
¶ 41. Our plain-error standard is well established:
(1) there must be an error; (2) the error must be obvious; (8) the error must affect substantial rights and *479 result in prejudice to the defendant; and (4) we must correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. When reviewing possible error in a jury instruction, we examine the instructions in light of the record evidence as a whole and determine if any error would result in a miscarriage of justice. Moreover, we review the instructions in their entirety. If the charge as a whole is not misleading, there is no plain error. This is a very high bar — we find plain error only in rare and extraordinary cases.
State v. Herrick, 2011 VT 94, ¶ 18, 190 Vt. 292, 30 A.3d 1285 (citations omitted).
¶ 42. We find no plain error here, if any error at all. The jury instructions as a whole were not misleading, and defendant has not made a showing of any likely prejudicial impact on the jury’s deliberations. The court did not err by charging the jury that it could, but was not required to, infer an intent to kill from the manner in which the deadly weapon was used. See State v. Fucci, 2015 VT 39, ¶ 13, 198 Vt. 482, 117 A.3d 419 (“It is elementary that a defendant’s intent may be inferred from the nature of his acts.”). The court specifically told the jury that it had to find each essential element beyond a reasonable doubt in order to convict:
The State must prove each of the essential elements of this offense beyond a reasonable doubt. If in your judgment the State has failed to prove any one essential element, you must find the Defendant not guilty. However if you find the State has proved each essential element beyond a reasonable doubt, you must find the Defendant guilty.
Further, the court instructed the jury that it “should [weigh] all of the surrounding facts and circumstances established by the evidence to determine whether the State has proved that [defendant] intended to kill [the victim].” Multiple witnesses, including the surgeon who treated the victim, testified that the stab wound was so deep that the victim’s intestines began to spill out. The trauma surgeon further testified that the victim was stabbed in a vital area with “a relatively strong force” sufficient to cut through the *480 multiple layers of muscles and fasciae surrounding the intestines. Thus, the jury had sufficient evidence from which to infer an intent to kill on the part of the assailant. Cf. Johnson, 2013 VT 116, ¶ 29 (holding that two-inch laceration on neck exposing victim’s trachea “was sufficiently serious as to prove specific intent to kill”).

Affirmed.