NOTICE:  This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports.  Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2016 VT 79

No. 2014-299

| | |
|---|---|
| State of Vermont | Supreme Court |
| | |
| | On Appeal from |
| v. | Superior Court, Chittenden Unit, |
| | Criminal Division |
| | |
| Glen Haskins, Jr. | October Term, 2015 |

Michael S. Kupersmith, J.

Thomas J. Donovan, Jr., Chittenden County State's Attorney, and Pamela Hall Johnson, Deputy State's Attorney, Burlington, for Plaintiff-Appellee.

Matthew F. Valerio, Defender General, and Marshall Pahl, Appellate Defender, Montpelier, for Defendant-Appellant.


PRESENT:  Reiber, C.J., Dooley, Skoglund, Robinson and Eaton, JJ.


¶ 1.  **REIBER, C.J.**  This is an attempted murder case.  At trial, defendant theorized that a group of late-night club-goers with whom he was partying conspired to frame him for a stabbing that occurred in downtown Burlington shortly after two o'clock in the morning of January 15, 2012.  Defendant argues that the trial court erred by excluding exculpatory testimony and by giving misleading jury instructions regarding reasonable doubt and permissive inferences.  We affirm on all issues and uphold defendant's conviction.

¶ 2.  Three important features defined this case at trial.  First, there was confusion over who stabbed the victim. This confusion was created by the quickly unfolding nature of the events that led to the stabbing, the number of people at or near the scene of the altercation, the victim's

inability to identify the person who stabbed him, and the incomplete and conflicting recollections of witnesses. Second, due to the lack of physical evidence linking defendant to the stabbing, the State's case relied principally on the testimony of various witnesses, including the victim, two women who witnessed the stabbing from their nearby parked car, three members of the group of club-goers, defendant's former girlfriend, defendant's surrogate mother, a trauma surgeon who treated the victim, and several Burlington Police Department officers who responded to or investigated the crime. Third, as noted, defendant's primary theory at trial was that the group of friends he was with at the scene conspired to frame him to protect the actual perpetrator among them. He emphasizes that members of the group did not implicate him in the crime until after they were initially interviewed by police.

¶ 3. The jury was tasked with piecing together multiple witnesses' testimony—much of which was incomplete or conflicting—into a coherent picture of what occurred that night. The following rendition of the facts is drawn from that testimony. On the night of January 14, 2012, defendant met his former girlfriend, Sarah Giles, at a pool hall in downtown Burlington. Giles and defendant had dated from the end of October 2011 until shortly before the New Year, and had lived together at Giles' apartment for part of that period. They met that night contemplating getting back together again, and they engaged in hugging and kissing at the pool hall. Giles informed defendant that she planned to go to a local nightclub later with their mutual friend, Jess Sturtevant, with whom defendant had grown up.

¶ 4. Giles and Sturtevant arrived at the nightclub at approximately ten-thirty in the evening and encountered Shaun Couture, Chad Limoge, Jess Cornell, and Hannah Yuric. Giles had known Cornell and Yuric since high school, but did not know Couture and was only tangentially aware of Limoge, who was Couture's cousin and Cornell's boyfriend. Defendant arrived at the club with two of his friends about an hour after Giles and Sturtevant had gotten there. Defendant and Giles continued to interact romantically at the club.

¶ 5. Several minutes past two in the morning after the club closed, defendant, Giles, Sturtevant, Cornell, Yuric, Couture, and Limoge went outside to get pizza at a next-door pizzeria. While they were outside, another man, Eric Hazen, who had been at the club and who Giles knew from high school, engaged defendant and Giles in a conversation. As the group waited for pizza, Cornell began yelling that she had been grabbed or punched by the victim, a stranger who was passing by on the sidewalk. Couture and Limoge confronted the victim, and an argument ensued. There was testimony from some members of the group, which was contradicted by the victim, that the victim attempted to punch Limoge but inadvertently struck Cornell instead. At that point, several members of the group—defendant, Couture, Limoge, Hazen, and Yuric—began pursuing the retreating victim to the end of the block. Giles testified that she yelled at defendant to come back, and that he did so initially but turned around again to join the others in pursuit of the victim.

¶ 6. The exact details of the stabbing itself are even less clear. The victim testified that he was followed around a corner by two men from the group, and when those two men confronted him, he squared up to fight. Although the victim did not remember much about the perpetrator's appearance, he recalled that one of the men, the taller of the two, lunged in towards him. The victim testified: "I just felt like a punch in my stomach, and then I knelt down . . . trying to catch my breath. And then I felt it was like wetness, and then I saw blood going down and I was like, 'Fuck, you fucking stabbed me.' "

¶ 7. Couture testified that defendant had stabbed the victim. According to Couture, he followed the victim down the street from where the altercation started and around the corner, at which point defendant ran past him and appeared to punch the victim in the stomach before running away. Two women who were in a parked car near where the stabbing took place testified as to what occurred and described the assailant. The woman with the clearer recollection of the altercation testified that the victim—a black man—came around the corner

3

while being followed by two white men. According to the witness, after the victim said something like "I ain't got your shit," the taller of the two men leaned in and made a swiping motion toward the victim's midsection, after which both white men ran off, heading in different directions once they reached the corner from which they had come.

¶ 8. Within seconds of being stabbed, the victim flagged down a police cruiser. Shortly thereafter, other police officers in the area encountered Couture, Limoge, and Yuric. At some point, Giles contacted defendant, who had gone to the nearby apartment of his friend, Chad Ely, the son of Emma Ely, who testified that defendant had been a close part of her family since he was five years old. Giles, Sturtevant, and Cornell then went to Ely's apartment to join defendant. The three women remained at the apartment for about half an hour, until Sturtevant was able to get hold of Yuric, at which point the women went to the Burlington police station to be interviewed. In the early morning hours of January 15, the police interviewed Couture, Limoge, Yuric, Giles, Sturtevant, and Cornell, none of whom mentioned defendant's presence at or involvement in the altercation.

¶ 9. After the interviews, Giles, Sturtevant, Couture, and Limoge left the police station together in Giles's car. There was conflicting testimony as to how it transpired, but during the ride Couture told Limoge, who in turn told the women, that Giles's boyfriend had stabbed the victim. Couture reported that to the police the next day. Meanwhile, Giles contacted defendant through Facebook and told him that people were saying he had stabbed the victim. When defendant responded to her message later that morning, Giles asked defendant what had happened the previous night, and he told her that they could talk about it later. Giles testified that she met defendant later that day, at which time he admitted to her that he had stabbed the victim because he thought the victim had struck Sturtevant. Giles further testified that she encouraged defendant to turn himself in to police, but when he later denied being the assailant in another Facebook exchange with her, she went to the police on January 17 and told them

4

defendant had admitted stabbing the victim. Giles agreed to meet with defendant wearing a body wire, but during their recorded conversation he did not admit to stabbing the victim. Defendant was arrested and charged with attempted second-degree murder.

¶ 10. At trial, defendant's primary theory was that the group of party-goers conspired to frame him to protect the actual perpetrator among them. Apparently unconvinced by this theory, the jury returned a guilty verdict, and defendant was sentenced to twenty years to life, all suspended except for twelve years. On appeal, defendant alleges that the trial court erred by: (1) not allowing a police officer to testify that Limoge telephoned police on the morning of January 15 to report that he had overheard Giles and Sturtevant saying that defendant stabbed the victim; (2) incorrectly instructing the jury on the meaning of reasonable doubt; (3) suggesting in its intent-to-kill instruction that defendant harbored such intent; and (4) not telling the jury that it had to find each basic fact beyond a reasonable doubt in order to infer this intent.

I.

¶ 11. Defendant first argues that the trial court erroneously refused to allow a police officer to testify that Limoge called police not long after he was initially interviewed to report that he had overheard Giles and Sturtevant in the car ride from the police station saying that defendant was the one who had stabbed the victim. Defendant argues that the trial court should not have excluded the testimony as hearsay because it was offered for its falsity rather than its truth. We agree that the trial court erred in excluding the testimony, but conclude that the error was harmless.

¶ 12. At trial, defense counsel sought to elicit testimony regarding how defendant was identified to police as the person who stabbed the victim. The following exchange occurred during defense counsel's cross-examination of Giles:

> Q: If Mr. Limoge were to say to the police that on the car ride
> from the police station to the Champlain Farms he had overheard

5

the girls talking about who had done it and that's . . . how he learned about who did the stabbing, would that be accurate?

. . . .

A: No.

A similar exchange occurred during defense counsel's cross-examination of Couture:

Q: If Chad Limoge called the police after you had left the police station, 6:00, 7:00 in the morning, and called the police and said, "He knew it was [defendant] because he overheard the girls talking about it, and they said it was [defendant]," that would be the truth, would it?

A: I don't know. I know what I said, so.

Q: You didn't overhear the girls talking, saying, "Hey, we know it's [defendant] that did this?"

A: No

¶ 13. Later, on the third day of trial, the following exchange occurred during defense counsel's examination of the officer who answered Limoge's telephone call:

Q: Okay. At some point after Mr. Limoge leaves, did you receive a phone call from Mr. Limoge?

A: Yes.

. . . .

Q: Okay. And did you speak with him?

A: Yes.

Q: And what did he have to say?

At that point, the prosecutor objected on hearsay grounds. Defendant stated that he was not offering the testimony for the truth of the matter asserted but rather for the fact that Limoge made the call and lied to police about Giles and Sturtevant saying that defendant was the assailant. The trial court ruled, however, that the statement was inadmissible as hearsay, and advised defense counsel that he would have to call Limoge as a witness if he wanted the testimony admitted.

6

¶ 14.   The trial court has wide discretion in ruling on the admissibility of evidence.  See State v. Noyes, 2015 VT 11, ¶ 13, 198 Vt. 360, 114 A.3d 1156.  We will set aside evidentiary rulings only if a defendant shows "that the court's discretion was either totally withheld or exercised on grounds clearly untenable or unreasonable."  State v. Parker, 149 Vt. 393, 401, 545 A.2d 512, 517 (1988) (quotation omitted).  The State argues that, given its wide discretion, the court had a reasonable basis for excluding the officer's testimony regarding Limoge's statements and that, even if the court's ruling was erroneous, it was harmless.  State v. Madigan, 2015 VT 59, ¶ 32, ___ Vt. ___, 122 A.3d 517 ("When the admission of evidence, exclusion of evidence, or propriety of argument is objected to in the trial court and raised on appeal, we review for harmless error, determining whether (1) the ruling was erroneous, and (2) if so, whether 'a substantial right' of defendant was affected.").

¶ 15.   We conclude that the trial court erred in excluding the proffered testimony on hearsay grounds because the testimony was not offered to prove the truth of the matter asserted. See V.R.E. 801(c) (" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."). The testimony was not offered to prove that Limoge heard Giles and Sturtevant talking about defendant being the assailant, but rather the opposite—to suggest that Limoge was lying to police about what he overheard the women saying.  This does not constitute hearsay.  See United States v. Hathaway, 798 F.2d 902, 905 (6th Cir. 1986) ("[S]tatements offered to prove the falsity of the matter asserted are not hearsay."); see also United States v. Brown, 560 F.3d 754, 765 (8th Cir. 2009) (holding that witness's statement to police "was not introduced for the truth of the matter asserted, but to show that he was lying," which is not inadmissible hearsay).

¶ 16.   Defendant contends that the error was not harmless because it undercut the defense's primary theory that the close-knit group, particularly Couture, Limoge, and Giles, conspired to falsely accuse him of stabbing the victim.  According to defendant, because

7

Limoge's telephone call to the police was the first time police were told that defendant was the assailant, if he could have shown Limoge was lying about Giles and Sturtevant saying it was him, it would have bolstered his conspiracy theory. Upon review of the record, we conclude that the trial court's error in not allowing the police officer's response was harmless.

¶ 17. We will uphold defendant's conviction if we find that the error was harmless beyond a reasonable doubt. State v. Lipka, 174 Vt. 377, 384, 817 A.2d 27, 33 (2002) ("We can uphold a criminal conviction, despite a confrontation clause error, if we find that the error was harmless beyond a reasonable doubt."). In conducting this analysis, we do not play the role of factfinder; rather, our focus is on the jury and whether it would have returned a guilty verdict even if the excluded testimony had been admitted. See id. (holding that error is harmless and conviction will be upheld upon determination beyond reasonable doubt that jury would have convicted even if error had not occurred). The two primary components of this determination are weighing (1) the strength of the case against defendant without the excluded evidence, and (2) the strength of the excluded evidence. Id. at 385, 817 A.2d at 34 ("The two most important factors in the harm equation we must employ are the strength of the prosecution's case without the offending evidence and the strength of the offending evidence."); see also Coy v. Iowa, 487 U.S. 1012, 1022 (1988) ("[H]armlessness must . . . be determined on the basis of the remaining evidence.").

¶ 18. We first examine the strength of the State's case. The State's principal hurdle in this case was identifying defendant as the person who stabbed the victim. Without question, and not surprisingly given the number of witnesses, the inebriated state of several of those witnesses at the time of the altercation, the occurrence of the assault outside at night in limited light, and the rapidity of the events that led to the stabbing, there was conflicting testimony concerning the identity of the assailant. Nevertheless, the State presented substantial evidence identifying defendant as the person who stabbed the victim.

8

¶ 19. The State presented three eyewitnesses to the stabbing, two of whom were not part of the group that defendant claims framed him. Couture was the eyewitness who was part of the group. He was identified as one of the two persons—the shorter one with a burnt orange or camouflage top—who turned the corner and approached the victim right before the stabbing. Hence, he certainly would have known who stabbed the victim. His testimony is brought into question, however, by defendant's theory that he lied to protect another member of the group. We will address this theory in more detail later.

¶ 20. As noted, the other two eyewitnesses were not part of the group and defendant has not suggested that they had any reason to lie about what they saw. One of the two women in the car parked nearby to where the assault occurred expressed some uncertainty about the appearance of the assailant, although she thought he was the taller of the two men approaching the victim. The other woman, however, accurately described what Couture was wearing and expressed certainty that the assailant was not him but the taller of the two men, who was around six feet tall, with a scruffy chin, and wearing a blue and green plaid zippered hoodie with a white background. The State presented substantial evidence at trial that defendant was about six feet tall and a couple inches taller than Couture, had a scruffy goatee, and was wearing a button-up blue-and-white plaid flannel shirt that Giles had given him for Christmas in December 2011. The witness who described defendant's appearance also testified that immediately after the stabbing, the two white men retreated to the street from which they had come, with the assailant then heading south and the other man heading north. This testimony was consistent with where Couture was apprehended by police and also the direction defendant would have gone to arrive at Chad Ely's nearby apartment.

¶ 21. To be sure, defendant points out that the disinterested eyewitness described the assailant as wearing a hooded sweatshirt with a plaid design and zipper, while other evidence indicated that defendant was wearing a button-up plaid flannel shirt that night. Moreover,

9

defendant elicited testimony from the first officer on the scene that she saw two men running from the direction of the stabbing and that one of them she knew to be Erik Hazen was wearing a plaid sweatshirt. On cross-examination, however, the officer acknowledged that her memory of Hazen's attire was placed in doubt by the fact that the dispatches that night from her call-in indicated she had described Hazen as wearing a black jacket, which was confirmed by the testimony of other witnesses. Thus, the officer's testimony does not significantly undermine the testimony of the disinterested eyewitness that the stabber was wearing a plaid top similar in color to what defendant was wearing that night.

¶ 22.    There was also evidence that defendant regularly carried a knife and that he had one on him on the night of the stabbing. Both Giles and Emma Ely testified that defendant regularly carried a knife on him. Giles testified that while dancing with defendant on the night of the assault she felt the knife in his pocket. The State also presented testimony that the police were unable to find defendant's knife or the shirt he was wearing the night of the assault, despite obtaining warrants and searching various locations. This is consistent with Giles' testimony that defendant told her that he got rid of the knife.

¶ 23.    Moreover, the State presented significant evidence of defendant implicating himself as the stabber. Most notably, Giles testified that defendant told her he was the one who stabbed the victim. Although Giles was unable to obtain—at the urging of police—defendant's confession while she was wired, defendant did state to others that he had confronted the victim, that the victim punched him, and that he heard someone yell out: "Did you stab him?" Chad Ely's wife, Amanda Carr, who saw defendant when he came to their apartment after the stabbing, testified that defendant told her he had confronted the victim and got hit. Thus, defendant admitted confronting the victim around the corner and he matched the description of the stabber of the two men who turned the corner to confront the victim.

¶ 24. The State also presented two sets of Facebook exchanges between Giles and defendant. In the first, Giles told defendant that others were saying he was the stabber, and he responded by suggesting they talk about it later. In the second, which occurred after defendant's alleged admission to Giles and her agreement with police to aid them in obtaining a confession from him, she encouraged him to turn himself in and he denied being the stabber. He asked if he could talk to her in person because "Facebook is not a good thing." The State elicited testimony from Amanda Carr that she participated in the second Facebook conversation he had with Giles and she warned him not to meet with Giles because Giles was setting him up—which could explain why later during the wired conversation Giles was unable to get defendant to repeat his admission to having stabbed the victim.

¶ 25. As for the strength of Giles's testimony that defendant admitted to her that he was the person who stabbed the victim, there was very little evidence to bolster defendant's theory that she was part of a conspiracy to frame him. Indeed, both Giles and Emma Ely, defendant's surrogate mother, testified that defendant and Giles were contemplating getting back together and acted as such the night of the stabbing. There is no evidence suggesting that they had a falling out that night. Defense counsel tried to elicit testimony from Giles that she was "pissed" at defendant that night, but redirect examination revealed that her prior deposition testimony was that she was "pissed" at seeing defendant's former girlfriend staring at them from the bar— nothing more. Following the stabbing, Giles went to Chad Ely's apartment to see defendant. She did not seek to distance herself from him until his alleged admission to her that he was the stabber and his reluctance to turn himself in.

¶ 26. Regarding any inclination Giles might have had to frame defendant to protect someone else, there was no evidence as to whom she was allegedly protecting. The most logical beneficiary of any conspiracy to frame defendant would have been Limoge, who was very close to Couture and was one of the persons who followed the victim down the street after the victim

allegedly groped or struck his girlfriend. As noted, however, Giles testified that she did not even know Couture until the night of the incident and was only tangentially aware of Limoge, who was the boyfriend of her friend, Cornell. Moreover, the State played a recording from a video camera located at the pizzeria showing Limoge returning to the pizzeria within approximately thirty-five seconds of the start of the scuffle—indicating that it was highly unlikely Limoge had time to run down the street, confront and stab the victim, and then return to the pizzeria. Hazen was also a potential suspect, but the only evidence to support a conspiracy theory to protect him was that he was a friend of Couture and had gone to the same high school a year behind Giles. Furthermore, neither the physical appearance nor the attire of either Hazen or Limoge fit the principal eyewitness's description of the assailant. All and all, despite inconsistencies in the testimony of the various witnesses as to what occurred on the night of the stabbing, defendant's conspiracy theory was weak and the State presented a relatively strong case identifying defendant as the assailant.

¶ 27. In discussing the strength of the State's case, the dissent correctly states that "[t]he record reflects extensive contact and communication among the various witnesses after their initial police interviews corresponding to a developing collective sentiment that defendant, and not the others, should be held accountable for the stabbing." Post, ¶ 90. The record also reflects that none of that contact or communication reveals any kind of conspiracy to frame defendant. Rather, it reflects the witnesses' determination not to take the fall for defendant's actions. For the most part, that evidence was presented by the State and was favorable to the State's case.

¶ 28. We now examine the strength of the excluded evidence. In doing so, we also consider "the extent to which the offending evidence was inculpatory, whether it was cumulative or duplicative of other evidence, and how prominent it was at trial." State v. Groce, 2014 VT 122, ¶ 19, 198 Vt. 74, 111 A.3d 1273 (quotation omitted). The excluded evidence was a police

12

officer's testimony confirming that Limoge called the police station later the same morning that the members of the group were first interviewed and informed police that he overheard Giles and Sturtevant talking in the car ride from the police station about defendant being the person who had stabbed the victim. Defendant argues on appeal that if he had been allowed to prove that the first accusation against him was fraudulent, it would have bolstered his theory that the later accusations by Couture and Giles were also fraudulent.

¶ 29. The logic behind this reasoning is not apparent. It is undisputed that the question of the stabber's identity arose during the car ride from the police station. Couture testified that at some point he told Limoge that the stabber was the guy whom Giles had been with that evening. He also testified that Limoge may have then told Giles and Sturtevant who the stabber was, but he was not sure. Giles testified that after Limoge spoke to Couture he informed her that the guy she had been with was the stabber. It is unclear why Limoge would have told the police that he overheard Giles and Sturtevant saying that defendant was the stabber—perhaps because at that point Couture and Limoge were considered suspects in the stabbing—and it is also unclear why the jury would have considered this excluded testimony to be exculpatory with respect to defendant. One would think that if members of the group were conspiring to falsely name defendant as the stabber, they would have gotten their stories straight.

¶ 30. The excluded testimony did not go to the ultimate issue of defendant's guilt or innocence, but rather was intended to strike at the credibility of those group members who testified against defendant, thereby contributing to defendant's theory that he had been framed by the group. Cf. id. ¶ 22 (stating that erroneously admitted testimony was "highly prejudicial" and "inculpatory because it went directly to the ultimate issue of defendant's guilt—it was not peripheral, but rather went to the very heart of the State's case"). This case was not a swearing contest between a complainant and a defendant, however. As indicated above, there was substantial additional inculpatory evidence from multiple witnesses pointing to defendant, and

the excluded testimony directly attacked the credibility of a nonwitness, not a complainant. Cf. id. ¶ 21 (noting that "only defendant and complainant testified as to what happened during the alleged sexual encounter"); see also State v. Herring, 2010 VT 106, ¶ 13, 189 Vt. 211, 19 A.3d 81 (refusing to find harmless error and stating that right to confront witnesses and impeach their credibility "is most important when the prosecution's case . . . essentially depends on the credibility of a single witness"); State v. Hazelton, 2006 VT 121, ¶¶ 20-21, 181 Vt. 118, 915 A.2d 224 (refusing to find harmless error where case was swearing contest between complainant and defendant, and trial court erroneously allowed two witnesses to recite complainant's testimony to bolster her credibility); Lipka, 174 Vt. at 385, 817 A.2d at 34 (concluding that seating that prevented defendant from seeing minor witness was not harmless because case presented "a classic swearing contest" to jury). In short, it is difficult to say that the excluded testimony had any real significance.

¶ 31. Moreover, defense counsel informed the jury in his opening statement that there would be conflicting testimony as to when defendant was first identified as the stabber and that Limoge first called police to tell them he overheard Giles and Sturtevant saying that defendant was the stabber. Defense counsel then got both Couture and Giles to concede during their testimony that it would not have been true if Limoge had told police that he overheard Giles and Sturtevant saying that defendant was the stabber. Defense counsel further asked Couture whether Limoge had called the police and given them defendant's name, to which Couture responded that he may have and that "the police said he called that same day." This was confirmed by the police officer's testimony that Limoge did in fact call police after leaving the station and spoke to the officer. Thus, while the jurors could not consider as evidence the defense's unchallenged claim as to what Limoge said, they knew that he called police shortly after the initial interviews presumably to report something about the stabbing incident.

14

¶ 32. In sum, given the strength of the State's evidence of defendant's guilt and the relative insignificance of the excluded testimony, it is clear beyond a reasonable doubt that the jury would have returned the same guilty verdict even if the trial court had allowed the excluded testimony.

II.

¶ 33. Defendant next argues that the trial court committed structural error by instructing the jury that the term "beyond reasonable doubt" means being convinced with "great certainty." In explaining reasonable doubt, the court told the jury, in part:

> A few things in life are absolutely certain. To say that you believe something beyond a reasonable doubt is to say that you're convinced of it with <u>great certainty</u>. But proof beyond a reasonable doubt does not require you to be absolutely or 100 percent certain. A reasonable doubt may arise from the evidence or from the lack of evidence.
>
> . . . .
>
> You must find the Defendant not guilty when you have a reasonable doubt. Even if you believe he is probably guilty. You may find him guilty only if you have no reasonable doubt. You need not be able to articulate or voice an explanation for your doubt. And the doubt that . . . you have as an individual need not be the same doubt held by your fellow jurors. Under no circumstances may a guilty verdict be based upon conjecture or suspicion.

(Emphasis added.)

¶ 34. According to defendant, the court committed reversible error by using the phrase "great certainty" rather than "utmost certainty"—a phrase used by the U.S. Supreme Court in the following sentence in <u>In re Winship</u>, 397 U.S. 358, 364 (1970): "It is also important in our free society that every individual going about his ordinary affairs have confidence that his government cannot adjudge him guilty of a criminal offense without convincing a proper factfinder of his guilt with <u>utmost certainty</u>." (emphasis added). We recently rejected an identical argument in <u>State v. Levitt</u>, 2016 VT 60, ¶¶ 5-14, ___ Vt. ___, ___ A.3d ___. We

15

noted that the statement in <u>Winship</u> was "part of the explanation of why due process requires a beyond-a-reasonable-doubt standard of proof in juvenile delinquency cases" and "did not require that the term 'utmost certainty' be part of jury instructions." <u>Id</u>. ¶ 5. After reviewing our precedents and noting that our sister states and the federal courts afforded no "talismanic significance" to the phrase "utmost certainty," <u>id</u>. ¶¶ 9-12, we concluded there was no error, let alone plain error, in the trial court's use of the phrase "great certainty." <u>Id</u>. ¶ 13. In so ruling, we examined the trial court's reasonable-doubt charge as a whole, noting in particular the court's emphasis on the defendant's presumption of innocence and its repeated references to the reasonable doubt standard without attempting to define the term. <u>Id</u>.

¶ 35. Similarly, in this case the trial court emphasized on multiple occasions that defendant was to be presumed innocent, that he had an absolute right to rely on that presumption and was not required to produce witnesses or evidence to prove his innocence, that the State was required to rebut the presumption of innocence by producing evidence of defendant's guilt beyond a reasonable doubt, that the State had to prove each essential element of the charged offense beyond a reasonable doubt, that any reasonable doubt compelled a not-guilty verdict, that the doubt any individual juror had did not need to be the same doubt held by any other juror, and that under no circumstances could a guilty verdict be based on conjecture or suspicion. Accordingly, there was no error here. As we stated in <u>Levitt</u>, however, we discourage any attempts to explain the term "reasonable doubt," which we have described as a "hazardous undertaking." <u>Id</u>. ¶ 14 (quotation omitted).

### III.

¶ 36. Defendant next argues that the trial court's instruction regarding inferring an intent to kill impermissibly suggested to the jury that the evidence proved the assailant's specific intent to kill. The court gave the following instruction regarding intent:

16

The second essential element is that the Defendant attempted to kill [the victim] by stabbing him in the abdominal area. An attempt requires both specific intent to commit a particular crime and an open physical act designed to carry out that intent. The State must prove the Defendant acted with a specific intent to kill [the victim]. Specific intent means a decision to act with a conscious objective of accomplishing a certain result; in this case, the killing of [the victim]. The intent with which a person doesn't act may be shown by the way in which he or she expresses it to others or by his or her conduct.

<u>You, but are not required to infer intent to kill from evidence that a deadly weapon was used. And from the manner in which it was used.</u> In considering [defendant's] intent, you should [weigh] all of the surrounding facts and circumstances established by the evidence to determine whether the State has proved that he intended to kill [the victim].

The State must also prove that the Defendant engaged in at least one open physical act designed to carry out his intent. Threatening words are not enough to be an act. You must distinguish between mere preparation and the actual start of the criminal conduct.

Merely planning the offense or doing some act which might be innocent in itself is not enough. An act is sufficient to be an attempt to commit an offense if it is done intentionally and if it progresses far enough to be the beginning of the crime. The act must be part of a series of events which would lead to the completion of the crime if not interrupted or prevented.

At trial, defense counsel objected to the underlined language, arguing that the court should also have told the jury it could find that defendant merely intended to injure or seriously injure the victim.

¶ 37. We conclude that the court's instructions on intent, as a whole, properly stated the law to the jury. See State v. Gokey, 136 Vt. 33, 36, 383 A.2d 601, 602 (1978) ("If the charge, taken as a whole and not piecemeal, breathes the true spirit of the law, and if there is no fair ground to say that the jury has been misled, then it ought to stand."). First, the court accurately charged the jury that defendant had to have had "a specific intent to kill" rather than merely an intent to do the act of stabbing. See State v. Blish, 172 Vt. 265, 272, 776 A.2d 380, 386 (2001) ("[W]e have specifically held that the intent component of voluntary manslaughter is the same as

that required for second degree murder—actual intent to kill, intent to do serious bodily injury, or extreme indifference to human life."). Second, the court stated that the jury may infer intent from the circumstantial evidence presented to it. See State v. Cole, 150 Vt. 453, 456, 554 A.2d 253, 255 (1988) ("Intent is rarely proved by direct evidence; it must be inferred from a person's acts and proved by circumstantial evidence."); see also State v. Bacon, 163 Vt. 279, 292, 658 A.2d 54, 63 (1995) ("Although the State must prove the requisite intent of each participant in a felony murder with regard to the murder as well as the underlying felony, the jury may infer such intent from circumstantial evidence."). Third, the court correctly explained "attempt" in the context of attempted murder. The court instructed the jury that it had to find an "open physical act" rather than "[m]erely planning the offense." State v. Johnson, 2013 VT 116, ¶ 29, 195 Vt. 498, 90 A.3d 874 ("There are two elements to Vermont's attempt statute . . . (1) intent to commit a crime, and (2) an overt act designed to carry out that intent." (quotation omitted)).

¶ 38. In holding that the instructions properly stated the law, we explicitly reject defendant's argument that the court erred by telling the jury that it could rely on the use of a deadly weapon, as well as the manner in which it was used, to find intent to kill. On this point, defendant argues that the court improperly intimated to the jury that it should find only an intent to kill, as opposed to an intent to injure defendant. According to defendant, the court should have also instructed the jury that it could find that he was merely intending to injure the victim.

¶ 39. Defendant is correct that because of the deference that jurors may accord to the trial judge, the court may not comment on the evidence in a way that particularly draws attention to the claims of one party. See State v. Camley, 140 Vt. 483, 489, 438 A.2d 1131, 1134 (1981) ("Our Vermont law further restrains a judge from commenting on the evidence in a way which gives undue prominence to any fact, claim or circumstance. This is because a judge's lightest word or intimation is received by a jury with great deference, and may prove controlling." (citation omitted)); see also State v. Brisson, 119 Vt. 48, 53, 117 A.2d 255, 258 (1955) (reversing

18

criminal verdict where "the trial judge attempted to chart the course the jury should follow in search of the truth"). In this case, however, the trial court's reference to "the manner in which [the knife] was used" does not amount to a comment on the evidence or imply that the court believed that the manner of use showed an intent to kill. Moreover, that part of the instruction to which defendant objects explicitly told the jurors that they were "not required to infer intent to kill." Hence, defendant's claim of error is unlike those in cases in which we have found error in a permissive inference instruction. See State v. Vuley, 2013 VT 9, ¶ 1, 193 Vt. 622, 70 A.3d 940 (reversing conviction because jury instruction did not properly explain doctrine of chances and did not instruct jury not to use propensity evidence to determine whether defendant was guilty, both of which were important aspects of trial); Camley, 140 Vt. at 490, 438 A.2d at 1134 (holding that it was reversible error to link "not guilty" option to condition that jury find defendant was acting in self-defense).

## IV.

¶ 40. Finally, defendant argues that the trial court committed plain error by instructing the jury that it could infer an intent to kill from evidence that a deadly weapon was used and the manner in which it was used, but failing to instruct the jury that it had to find that the basic facts giving rise to the inference were proven beyond a reasonable doubt. He contends that the court's instruction did not require the jury to decide whether a lethal weapon was used or whether such a weapon was used in a lethal manner, and did not inform the jury in what manner a weapon could be used to infer an intent to kill. According to defendant, rather than using the vague phrasing "from the manner in which it was used," the court should have instructed the jury that it would first have to find that the State proved beyond a reasonable doubt that defendant used the knife in a lethal manner. Defendant concedes that he did not object at trial to the permissive inference instruction on these grounds, but contends that the court committed plain error because the error was obvious and prejudicial and affected his due process rights.

19

¶ 41. Our plain-error standard is well established:

> (1) there must be an error; (2) the error must be obvious; (3) the error must affect substantial rights and result in prejudice to the defendant; and (4) we must correct the error if it seriously affects the fairness, integrity, or public reputation of judicial proceedings. When reviewing possible error in a jury instruction, we examine the instructions in light of the record evidence as a whole and determine if any error would result in a miscarriage of justice. Moreover, we review the instructions in their entirety. If the charge as a whole is not misleading, there is no plain error. This is a very high bar—we find plain error only in rare and extraordinary cases.

State v. Herrick, 2011 VT 94, ¶ 18, 190 Vt. 292, 30 A.3d 1285 (citations omitted).

¶ 42. We find no plain error here, if any error at all. The jury instructions as a whole were not misleading, and defendant has not made a showing of any likely prejudicial impact on the jury's deliberations. The court did not err by charging the jury that it could, but was not required to, infer an intent to kill from the manner in which the deadly weapon was used. See State v. Fucci, 2015 VT 39, ¶ 13, 198 Vt. 482, 117 A.3d 419 ("It is elementary that a defendant's intent may be inferred from the nature of his acts."). The court specifically told the jury that it had to find each essential element beyond a reasonable doubt in order to convict:

> The State must prove each of the essential elements of this offense beyond a reasonable doubt. If in your judgment the State has failed to prove any one essential element, you must find the Defendant not guilty. However if you find the State has proved each essential element beyond a reasonable doubt, you must find the Defendant guilty.

Further, the court instructed the jury that it "should [weigh] all of the surrounding facts and circumstances established by the evidence to determine whether the State has proved that [defendant] intended to kill [the victim]." Multiple witnesses, including the surgeon who treated the victim, testified that the stab wound was so deep that the victim's intestines began to spill out. The trauma surgeon further testified that the victim was stabbed in a vital area with "a relatively strong force" sufficient to cut through the multiple layers of muscles and fasciae

surrounding the intestines. Thus, the jury had sufficient evidence from which to infer an intent to kill on the part of the assailant. Cf. State v. Johnson, 2013 VT 116, ¶ 29, 195 Vt. 498, 90 A.3d 874 (holding that two-inch laceration on neck exposing victim's trachea "was sufficiently serious as to prove specific intent to kill").

Affirmed.

FOR THE COURT:

_____

Chief Justice

¶ 43. **ROBINSON, J.**, **dissenting.** I agree with the majority's conclusion that the trial court erred in excluding the officer's testimony regarding what Chad Limoge said to him when Limoge called to report that defendant had committed the crime. But I do not agree that the error was harmless. The State's evidence was far more equivocal than acknowledged by the majority, and the jury could have assigned more probative value to the excluded evidence than the majority has. Properly applying harmless-error review to the evidence in this case, I cannot join the majority's conclusion that the trial court's evidentiary error in this case was harmless.

I. Harmless-Error Review

¶ 44. Harmless-error review requires more searching consideration of the strengths and weaknesses of the State's case than the majority has undertaken here, and we should be especially cautious in reviewing for harmless error the erroneous exclusion of impeachment evidence undermining the credibility of the State's key witness or witnesses.

¶ 45. In State v. Carter, this Court considered the harmless error standard in depth. 164 Vt. 545, 552, 674 A.2d 1258, 1263 (1996). We first noted that "[t]he basic premise that errors must have some relation to the outcome of a criminal case, or some independent right of the defendant, before appellate intervention is warranted is stated in both the criminal and evidence

21

rules." Id. (citing V.R.Cr.P. 52(a); V.R.E. 103(a)). In short, there must be "some relationship between the error and the outcome." Id. at 552, 674 A.2d at 1264.

¶ 46.   Reviewing our harmless-error caselaw, this Court noted that until the late 1960s, it was rare for the Court to affirm a criminal conviction by holding that an error was harmless, and that generally the Court did so only "where there was no possibility that the error could have affected the conviction." Id. at 552-53, 674 A.2d at 1264. More recent cases, on the other hand, were not consistent with respect to the applicable standard, and were difficult to reconcile. Id. Accordingly, the Carter Court sought to clarify the standards for harmless error.

¶ 47.   The Court concluded that error, whether characterized as constitutional or nonconstitutional, is harmless "only if the appellate court can state 'a belief that it was harmless beyond a reasonable doubt.' " Id. at 553, 674 A.2d at 1264-65 (quoting Chapman v. California, 386 U.S. 18, 24 (1967)). We noted that this standard is "most consistent with the standard of proof in criminal trials and thus accords the greatest deference to the jury as trier of fact." 164 Vt. at 556, 674 A.2d at 1266. This Court emphasized that "we must approach harmless error arguments cautiously." Id. at 556-57, 674 A.2d at 1266.

¶ 48.   The next leading case involving our harmless error standard is State v. Lipka, 174 Vt. 377, 817 A.2d 27 (2002). In Lipka, the trial court erred by allowing a child witness to testify sitting at a table in front of the jury, with her back to the defendant. In assessing whether the error was harmless, this Court considered whether it could say beyond a reasonable doubt that a jury would have convicted if the child had not testified at all. We identified the "two most important factors in the harm equation" as "the strength of the prosecution's case without the offending evidence and the strength of the offending evidence." Id. at 385, 817 A.2d at 34.

¶ 49.   We noted that "it is important to understand that it is not the role of this Court to determine whether [a] defendant is guilty," and quoted Chief Judge Harry Edwards of the U.S. Court of Appeals for the District of Columbia Circuit, who cautioned against the seductiveness

22

of relying on the harmless-error rule where "a defendant's conviction appears well justified by the record." Id. (quoting H. Edwards, To Err is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?, 70 N.Y.U. L. Rev. 1167, 1170 (1995)). Judge Edwards explained, "[W]e have applied the harmless-error rule to such an extent that it is my impression that my colleagues and I are inclined to invoke it almost automatically where the proof of a defendant's guilt seems strong." Edwards, supra, at 1170. Accordingly, the Lipka Court noted that the issue is not "what we would do if we were the factfinder," but rather "what the jury might have done without the offending evidence." 174 Vt. at 385, 817 A.2d at 34.

¶ 50. In conducting its harmless-error review in Lipka, this Court noted that "[a]t base, this was a classic swearing contest." Id. Considering the evidence introduced at trial in detail, and the impact of the erroneously allowed testimony, the Court concluded that it could not say beyond a reasonable doubt that the jury would have convicted the defendant had the improperly admitted evidence been excluded. Id. at 389, 817 A.2d at 37.

¶ 51. Since Lipka, this Court has examined a number of cases in which admission of evidence in error was not harmless due, in part, to the central role of a witness's credibility to the State's case. For example, in State v. Hazelton, 2006 VT 121, 181 Vt. 118, 915 A.2d 224, a sexual-assault case, the jury heard two competing versions of events, one told through the complainant's testimony and another told through defendant's testimony. The case essentially boiled down to a credibility contest. This Court concluded that the trial court erred in permitting prior consistent statements of the complainant introduced through the investigating officer and the complainant's grandmother. Id. ¶¶ 3-14. In concluding that the error was not harmless, this Court noted

> With credibility being the key ingredient in this swearing contest
> between complainant and defendant, and absent any independently
> corroborating evidence of the assault, we cannot avoid a
> conclusion that it was reasonably possible, as intended, that the

23

erroneously admitted testimony influenced the jury's decision to
believe [the complainant].

Id. ¶ 20. The defendant's convictions were therefore reversed and remanded. Id. ¶ 22.

¶ 52. Other cases include State v. Groce, 2014 VT 122, ¶ 20, 198 Vt. 74, 111 A.3d
1273 (holding admission of defendant's friend's statement regarding friend's belief that
defendant could commit crime not harmless error where "[w]itness statements played a
substantial role in supporting the jury verdict, making witness credibility of paramount
importance"); State v. Madigan, 2015 VT 59, ¶ 33, __ Vt. __, 122 A.3d 517 (concluding
improper admission of testimony concerning witnesses' reputation for truthfulness was not
harmless where witness's credibility was critical to State's case); and State v. Blair, 155 Vt. 271,
276, 583 A.2d 591, 594 (1990) (holding that where credibility of witness was at issue in sexual-
assault case, Court could not say "that a third party's opinion of the credibility of the victim
could not have tipped the scales such that [the] defendant would have been acquitted").

¶ 53. Moreover, in a case more squarely on all fours with this one, we recognized the
particular harm of an erroneous ruling that excludes evidence offered by a criminal defendant to
impeach an important State witness. In State v. Herring, we explained,

> Improper exclusion of evidence to impeach a key prosecution
> witness is a serious error, implicating fair trial rights under both the
> United States and Vermont Constitutions. Although our harmless
> error analysis is generally identical in constitutional and
> nonconstitutional criminal cases, this Court specifically
> acknowledged that a trial court's discretion to restrict the
> impeachment of a key prosecution witness with evidence reflecting
> on [the witness's] credibility is limited by the protection afforded
> by the Confrontation Clause.

2010 VT 106, ¶ 8, 189 Vt. 211, 19 A.3d 81 (quotations and citations omitted). In considering the
trial court's refusal to allow a defendant to play a video of the complainant's prior testimony,
which the defendant hoped to use to impeach the complainant, this Court noted that "[t]he impact
of excluding impeachment evidence is particularly critical where there is no independently

24

incriminating proof beyond a reasonable doubt." Id. ¶ 10. This Court concluded that although "[i]n the instant case there was evidence tending to corroborate . . . the complainant's testimony," reversal was nonetheless warranted because this Court could not conclude beyond a reasonable doubt that "the impeachment evidence erroneously excluded would have had no impact on the jury's credibility assessment in this contested case." Id. ¶¶ 10-11; see also Dionas v. State, 80 A.3d 1058, 1066 (Md. 2013) ("We have stated frequently that, where . . . the jury's assessment of who is telling the truth is critical, an error affecting the jury's ability to assess a witness' credibility is not harmless error."); State v. Thomas, 308 P.3d 270, 273 (Or. Ct. App. 2013) (concluding that failure to admit relevant impeachment evidence where "evidence was highly probative of the credibility of the witness . . . whose testimony was the foundation of the prosecution's case" was not harmless error); State v. Pradubsri, 743 S.E. 2d 98, 101, 104-06 (S.C. Ct. App. 2013) (holding that trial court's failure to admit evidence of potential legal exposure of witness not harmless error because witness's testimony was essential to State's case).

## II. Evidence at Trial

¶ 54. With these standards in mind, I review the evidence in this case more closely, considering evidence supporting the jury's verdict, as well as evidence that could have supported a contrary verdict.

### A. Disinterested Eyewitnesses to the Assault

¶ 55. The stabbing took place around 2:00 a.m. on January 15, 2012 near the intersection of Church and King Streets in Burlington. The State's first witness was a disinterested observer who was sitting with a friend in her parked car on King Street at the time of the incident. She heard people arguing and saw a black male round the corner from Church Street onto King Street with two white men moving towards him. The black male had his hands up and was backing away from the white males. She heard him say, "I ain't got your shit." The

black male backed into the middle of the road, and one of the white males leaned in toward the black man, made a quick swiping motion, and then kept going. The black male stumbled toward a police vehicle that rounded the corner and asked the police to call an ambulance. The assailant headed south on Church Street, and his counterpart headed north.

¶ 56. As the witness approached the police car, she heard a different white male tell the police officer that a black man had committed the stabbing and had gone in a different direction. At that point she and her friend spoke up and reported what they saw.

¶ 57. This witness described the assailant who advanced on the victim in the road as a white male with dirty blonde to medium color hair. He was about 5′11″ to 6′, about 160 to 170 pounds, and was wearing a winter beanie-type hat, a zipper hoodie sweatshirt with a white base and a blue and green plaid square-like pattern above, and jeans. He was in his early to mid-20s, had a broader chin than the other man who pursued the victim with him, and was "kind of scruffy." Although she initially testified that she could not tell whether he had any facial hair, upon reviewing her prior deposition testimony, she testified that he had a goatee. The witness testified that her memory of the facial features of the assailant would have been pretty good the day after these events, but she was unable to identify defendant as the perpetrator in a photo array that she reviewed the next day. This witness described the second pursuer—the one who did not lunge at the victim—as around 5′10″ with darker hair and scruffy facial hair. He was wearing a burnt orange, rusty-colored pullover hoodie.

¶ 58. The second disinterested witness in the car described the assault in similar terms. She did not get a good look at the assailant, though she confirmed that he was white and thought he was around 6' tall. She initially testified that the man who did the stabbing was wearing a black hoodie, and that his friend had a beanie type winter hat on. Then she acknowledged that in a prior deposition she had actually testified that the assailant was wearing an "army fatigue coat." And, finally, she testified that in preparing for her trial testimony with the State's Attorney she

26

acknowledged that she may have gotten the information about the army fatigue coat from her friend, and that she really didn't know what the assailant was wearing. Like her friend, this second witness from the car heard somebody telling the police that two black men had assaulted the victim.

## B. Victim

¶ 59. The victim himself testified that after leaving a bar, he passed through a large crowd on Church Street. Two white men approached him and accused him of grabbing or smacking the buttocks of one of their female friends. The victim told the white males "I don't know what you're talking about" and kept walking. The two men pursued him, and all three swore at each other as the victim continued walking. At some point, the victim turned around and was skipping backwards while moving down the street facing the two white males. He testified that the taller white male started running towards him. The victim was under the impression that the two were going to fight. He and the taller white male squared up, when the victim felt a punch in his stomach. He knelt down to catch his breath and felt a wetness and saw blood. He yelled "you . . . stabbed me," and then the two men took off.

¶ 60. The victim testified that the person who stabbed him was one of the two white men who had been following him since he passed through the crowd outside a bar, not a third person who came running and stabbed him. He described the assailant as 6′ to 6′1″ tall, but did not otherwise offer identifying descriptions.

## C. Shaun Couture

¶ 61. Shaun Couture was one of the white men pursuing the victim. He testified that on January 14, 2015, he went out with his cousin Chad Limoge, Limoges's girlfriend Jessica Cornell, and another friend, Hannah Yuric. Couture had known each of these people for years. At the bar, the group ran into their friend Jess Sturtevant, who was with Sarah Giles, defendant's

girlfriend,* and defendant. Couture had been introduced to defendant, but did not know his name. At some point during the evening, Couture's other friend, Eric Hazen arrived, but Couture testified that Hazen was not really part of the group. Couture testified that he was wearing a camouflage jacket with boots that night and a winter hat, but that he lost the hat while at the bar. He also testified that he was 5′10″ tall.

¶ 62. After the bar closed, the group stepped outside together, intending to get pizza. Couture testified that at that point a black male walked past and grabbed Limoge's girlfriend's "backside." Couture confronted the black male (who turned out to be the victim), and Couture and Limoge and the black male began swearing back and forth. Limoge then took off his jacket and began shadowboxing with the man. Limoge was wearing a white t-shirt with a design on it underneath his jacket. The man then tried to punch Limoge, who ducked, resulting in the man hitting Limoge's girlfriend instead. The man then took off walking backward, facing Couture and Limoge, who followed him. As the man walked backward, pursued by Couture and Limoge, the three swore at each other. Limoge's girlfriend called him back and he stopped following the victim, but Couture continued to follow the man, yelling. Couture testified that he rounded a corner, and no one else was with him at the time. Couture engaged in an argument with the man from a distance of a car length, but the argument drew to a conclusion and they were walking their own ways. Then defendant appeared, walked past Couture, and punched the man. Defendant ran away, and Couture likewise bolted.

¶ 63. Couture returned to Church Street. At that point, he did not know that someone had been stabbed. On cross-examination, defense counsel asked Couture if he had told Yuric

---

* Giles testified that she and defendant had broken up a few weeks earlier, that they had agreed to hang out on the evening in question, that this was the first time they had seen each other since they had broken up, and that there were romantic feelings between them that evening. For ease of reference, I describe her as defendant's "girlfriend," although I acknowledge that this moniker may not be entirely accurate, and that this inaccuracy may be relevant to this witness's motives.

28

that there had been a stabbing, to which Couture responded no, because at that time he was unaware that the victim had been stabbed. When police officers arrived and asked Couture what happened down the street, he told them "nothing" and denied seeing anybody run up and punch or stab the victim. While Couture was talking with the officers, Limoge approached them "talking nonsense," and speaking very loudly. Police approached Limoge to talk to him separately. By that time, Limoge had put his coat back on.

¶ 64. Couture went to the police station where he was questioned for hours. He did not tell the police anything because he did not want to "rat" on anybody. Couture left the police station around five or six in the morning. He was picked up by Limoge, defendant's girlfriend, and their friend Sturtevant. While they were driving, and loud enough for the women to hear, Limoge admonished Couture to "give the person up" and told him to tell the truth. On cross-examination Couture acknowledged that during this drive Limoge was upset because he thought he was going to get in trouble. Limoge said to Couture, "You're going to get me a name because I'm not going to go to jail" for something Limoge had not done. Couture testified that during this drive he said nothing from which the women could infer that he was implicating defendant and the women said nothing to suggest that defendant had done this.

¶ 65. When they arrived at their destination, after the women stepped out of the car, Couture told Limoge that he knew who had committed the stabbing but he did not know the person's name. Limoge then told Couture defendant's first name. Couture was then driven to Limoge's house, where he and Limoge talked about what had happened and then the two passed out. Couture was with Limoge from the time they left the police station until they went to bed that night.

¶ 66. Later that day, Couture texted Sturtevant to figure out what to do next, and to find out defendant's last name. Portions of their text messages throughout the day were read into evidence, including a statement from Sturtevant where she wrote, "Hope you're not mad at me,

29

hope none of you are," to which Couture responded "I'm not mad, I'm just at your friend's boyfriend. I'm not going to jail for him." Sturtevant replied, "I don't—I know I don't want you to either. I asked [Limoge and his girlfriend] if [they] could stop by to talk to them tonight because I don't want you or [Limoge] getting in trouble." She also directed Couture to a Facebook page where he could find a picture of defendant. That afternoon, she wrote, "I want to help you and [Limoge]. I just can't be brought in the middle. I can't lose my LNA, I just got it, you know. But I also don't want either you in trouble." Later in the text conversation, Couture told Sturtevant that he was going to be charged with attempted murder if he did not "give him up." Sturtevant told Couture "Okay. Give him up. I mean he fucked up, not you. . . . If you can please keep me out of it, I'll get you the pic . . . But stay safe." Thereafter, Couture scheduled a meeting with a police officer to relay the information he had been given.

¶ 67. Couture acknowledged that he barely knew defendant, that he was not aware that defendant had any particular relationship with Limoge's girlfriend, whom Couture said the black male had struck, and that prior to the moment that he ran up and punched the black man, defendant was not involved in the altercation. He also acknowledged that when the police initially interviewed him, he said that defendant was wearing a white shirt, a blue coat, and a Yankees or Boston baseball cap.

### D. Defendant's Girlfriend

¶ 68. Defendant's girlfriend testified that after the group left the bar, she heard Limoge's girlfriend shouting that she had been punched. Defendant, Couture, Limoge, Yuric, and Hazen, all pursued the man who allegedly touched Limoge's girlfriend. Defendant's girlfriend called defendant back, and he returned partway to her, before turning back toward the commotion and leaving. Shortly after that, she called defendant, who by then was at a friend's apartment nearby, and asked whether she could come to the apartment to sober up and figure out where the other people had gone. She brought Limoge's girlfriend and Sturtevant with her.

30

¶ 69.    When she told defendant that there were officers swarming downtown Burlington, defendant did not react.  Around 3:00 a.m., defendant's girlfriend, Sturtevant, and Limoge's girlfriend went to take Limoge's girlfriend to the police station.  Defendant walked his girlfriend back to her car, near the scene of the incident.  The police questioned defendant's girlfriend while she was at the police station.  When asked who she was with that evening, she did not name defendant.  When asked if she saw anybody run down the street, she did not name defendant.

¶ 70.    She described the car ride from the police station with Couture, Limoge, and Sturtevant.  She said that Couture was saying that he knew who had done it and that "they were going to pay for it."  Limoge asked who it was, and Couture wouldn't say.  The men were yelling and Limoge emphasized that he was the one being told that he had done it.  At the end of the drive, after Sturtevant, Couture, and Limoge got out of the car, Limoge came to her car door and angrily told her that the guy that she was with was the one who did it and they were going to go after him and to thank him for making Limoge go back to jail.  On cross-examination, defense counsel asked: "If Mr. Limoge were to say to the police that on the car ride from the police station . . . he had overheard the girls talking about who had done it and that's . . . how he learned about who did the stabbing, would that be accurate?"  Defendant's girlfriend replied, "No."

¶ 71.    After Limoge told her that defendant had committed the stabbing, defendant's girlfriend reached out to defendant on Facebook to communicate about what happened in the early morning hours of January 15, 2012.  When she asked defendant about what happened the prior night, he simply responded "[w]e can talk about it later."  Defendant met with his girlfriend later in the day, and at that time defendant confessed to stabbing the victim.  He explained that he had been upset because he thought their friend Jess Sturtevant was the one who had been hit in the face.  Defendant repeatedly apologized for what he had done.  His girlfriend urged him to turn himself in.

31

¶ 72.    Following this exchange, defendant's girlfriend "defriended" him on Facebook, and he messaged her to ask why.  During the ensuing exchange, she responded that he needed to turn himself in.  He repeatedly said he didn't do anything, and asked to speak with her in person. He did not admit through the Facebook conversations to committing the stabbing.

¶ 73.    Subsequently, the police contacted defendant's girlfriend again, and she had another conversation with them.  She agreed to wear a body wire and personally talk to defendant, but when she did, defendant repeatedly denied stabbing the victim.

¶ 74.    Defendant's girlfriend testified that Couture was wearing a long sleeve black shirt on the night in question.  Although she initially testified that he was wearing a black jacket, upon refreshing her recollection she did not remember what the jacket was.  She said Hazen was wearing a black jacket and a black hat on backwards.  Defendant was wearing a loose-fitting plaid shirt that she had given him for Christmas over a white undershirt.  The plaid shirt was black, grey, white, and turquoise.  She testified that defendant is about 6′ tall.

E.  Hannah Yuric

¶ 75.    Hannah Yuric's memory was blurry.  She testified that at the time of the fight she tried to stop Couture from fighting but he pushed her out of the way so he could go fight. Thereafter, she saw Couture come up in a hurry.  He reported to her that somebody had gotten stabbed down there, and he had to get out of there.  Limoge then came running up and she repeated to Limoge what Couture had said.

¶ 76.    During her testimony, Yuric said she saw defendant run down to King Street; she tried to yell to him but his girlfriend said something like, "He'll be fine."  She acknowledged that when she initially gave a statement to the police immediately after the incident she told the police that she thought the stabber was Limoge and that she did not mention defendant at all that first night.  She acknowledged that she did not remember that it was actually defendant and not Limoge that went down the street until a year later when she had to give a deposition in this case.

32

## F. Testimony About Defendant's After-the-Fact Statements

¶ 77. Around the time of the incident, a friend of defendant's was at an apartment where defendant was staying, which was within two blocks of the assault. This witness testified that defendant arrived at the apartment in the early morning about an hour after she did, and that he told her he and a couple of other people had confronted a man who had hit a friend in the face. He reported that the man hit him, and was worried that the altercation might jeopardize his probation. This witness testified that she believed that defendant was wearing a blue plaid shirt at the time, although she didn't remember whether that was because she had actually seen him wearing the shirt or because everyone was talking about a blue plaid shirt. She testified that he was not wearing a zip-up hoodie when he arrived at the house.

¶ 78. Another witness, who was a mother figure to defendant, testified that he had reported to her after the altercation that a fight broke out because a man slapped a woman in the face and the woman's boyfriend confronted the man. She testified that defendant said that he was one of the people who confronted the man, but that he took off once a fight broke out because he did not want to be picked up for drunk and disorderly conduct because he was about to get off of probation.

## G. Testimony of Various Police Officers

¶ 79. Officer Stewart was in the passenger seat of the police cruiser that first encountered the incident scene. As the car traveled southbound on Church Street she saw two males run "with a purpose" across the street from the King Street area heading northeast to the Superior Court parking lot. Seconds later, the victim flagged the police down. She testified that when the black male approached her vehicle, his hand covered a portion of his abdomen. After telling Officer Stewart "they stabbed me," the man removed his hand, allowing his internal organs to spill out.

¶ 80.    Officer Stewart described the two men she saw running together from the scene moments before encountering the victim.  She said they were two white males.  She testified that one was wearing hunters orange and white and the other was wearing a hooded sweatshirt or plaid jacket.  She recognized the man wearing plaid from a local business establishment and later identified him as Eric Hazen.   On cross-examination, she acknowledged that if her communication over the police radio that night described a suspect wearing black, rather than plaid, her memory might be called into question; however, confronted with evidence suggesting that she previously described one of the fleeing suspects as wearing black, she firmly maintained that she recalled that Eric Hazen was one of the fleeing males and was wearing a plaid jacket or hoodie at the time.  The State did introduce testimony from a dispatcher who testified that the log generated contemporaneous with officers' reports reflects that Officer Stewart reported that a suspect was wearing a black jacket.

¶ 81.    An officer who responded to the scene moments after the stabbing testified that he saw someone running away from the site of the stabbing in a camouflage jacket.  He later identified the person as Shaun Couture.  The officer did not see anyone else running away from the scene.

¶ 82.    Another officer, Officer Mellis, heard a report that two people were running away from the scene, and encountered two people arguing in a nearby parking lot.  One was Couture and the other was Yuric.  When the pair saw the officer, Couture started to walk away.  After the officer asked Couture what was going on, another male—later identified as Limoge—yelled "Get off my brother" and began approaching them aggressively.  Limoge was wearing a black jacket that matched the description of one of the fleeing white males that another investigating officer had given over the radio.

34

¶ 83. An officer, who spoke with Eric Hazen after the incident, described Hazen as being around 5′8″ or 5′9″ with short dark hair and a short full beard. Finally, an officer who spoke with Limoge after the incident described Limoge as being 5′10″.

### III. Application of Harmless Error

¶ 84. With this evidence in mind, I turn to (1) the strength of the State's case; and (2) the significance of the excluded evidence.

¶ 85. The above account of the evidence introduce at trial suggests that the State's case had significant strengths <u>and</u> weaknesses. On the one hand, Couture, who was present at the scene, testified that defendant stabbed the victim; defendant's girlfriend testified that defendant had confessed to her; and a disinterested witness's description of the assailant, and most particularly his plaid outerwear, jibes with witness testimony that defendant was wearing plaid at the time of the incident. Defendant was seen running toward the scene of the crime moments before, and, based on his girlfriend's testimony about the knife in his pocket, had the means to commit a stabbing. The disinterested witness testified that the perpetrator ran south on Church Street after the assault, and defendant is the only one of the group who did not return to the area north of King Street shortly after the attack. This evidence does provide ample support for the jury's verdict.

¶ 86. On the other hand, defendant was only one of four men potentially implicated by the evidence. Based on the testimony, including his own, Couture was almost certainly one of the two men the disinterested witness saw pursuing the victim. Limoge, Hazen, and defendant were all seen pursuing the victim prior to the stabbing. A police officer testified that Hazen was fleeing the scene with Couture immediately after the stabbing, and evidence that an officer reported a suspect fleeing the scene in a black jacket potentially implicated Limoge, who was seen wearing a black jacket that night.

¶ 87.    A disinterested witness said the assailant was wearing a white zip-up hoodie with a plaid design on it, and a beanie-style winter hat.   But, although there was evidence that defendant was wearing plaid that night, the disinterested witness did not identify defendant as the perpetrator in a photo array the next day.   She was never offered a photo array that included a photo of Hazen, Couture, or Limoge.   In addition, defendant's girlfriend said he was wearing a plaid shirt rather than a zip-up hoodie, and that defendant was wearing a hat that matched his shirt.   Moreover, a police officer testified that Hazen, who was fleeing the scene with Couture, was also wearing plaid that night.   And, the second witness who watched the scene from inside a car first testified that the perpetrator was wearing a black jacket.   There was some testimony that Limoge was wearing black, and some that Hazen was wearing black.   That witness subsequently acknowledged that she had previously testified that the perpetrator was wearing camouflage— which Couture was wearing.   She ultimately said she did not know what the perpetrator was wearing.   The link between the testimony of the disinterested eyewitnesses and defendant's guilt is vulnerable to challenge on many levels.

¶ 88.    Couture testified that defendant was the perpetrator, but his description of how events unfolded was at odds with that of the disinterested witness and the victim.   The victim and the primary disinterested witness testified that the perpetrator was one of the two men who had been steadily pursuing the victim—an account at odds with Couture's testimony that he and Limoge had pursued the victim, and then Limoge dropped back and defendant appeared at the last moment and punched the victim.   Moreover, Couture had a strong incentive to tell a story that exonerated him and did not implicate his cousin, Limoge, or his friend, Hazen.   In addition, Couture himself admitted to lying to the police when they initially interviewed him at the scene and at the police station.  And Yuric's testimony that Couture told her someone had been stabbed immediately after the incident undermines Couture's claim that he did not even realize that a stabbing had occurred until the police told him.

36

¶ 89. Finally, defendant's girlfriend's testimony that defendant had confessed to her was damning, but she was unable to get defendant to acknowledge his confession in writing or in person when she was wearing a wire.

¶ 90. There was no physical evidence, recorded confession, or conclusive video recording in the case. The police did not recover a weapon (other than a knife they found on Limoge, which was not linked to the crime by blood or DNA). Instead, this case turned entirely on the credibility of the various witnesses. Their accounts were substantially incongruent. Moreover, none of the witnesses implicated defendant in their initial police interviews. Defendant was only implicated after the others in the social group had a chance to confer with one another. The record reflects extensive contact and communication among the various witnesses after their initial police interviews corresponding to a developing collective sentiment that defendant, and not the others, should be held accountable for the stabbing. The friendship and familial bonds between Couture on the one hand and Hazen and Limoge on the other, contrasted with their unfamiliarity with defendant, suggested a motive to pin the blame on defendant.

¶ 91. In light of the above, the State clearly had sufficient evidence to get to the jury, but this was anything but an open-and-shut case. The weaknesses in the State's case were substantial, and an acquittal would not have been at all surprising. Given this, it would be hard to conclude beyond a reasonable doubt that additional evidence undermining the State's case would not have made a difference.

¶ 92. Against this backdrop, though the excluded evidence may have been only marginally impactful, it would have reasonably supported defendant's theory of the case. Officer Mellis testified that after Limoge, Couture, and Yuric left the police station, he received a phone call from Limoge. The substance of this conversation was the errantly excluded testimony. Defense counsel proffered that Officer Mellis would testify that Limoge claimed to

have overheard defendant's girlfriend and Sturtevant talking in the car, and implicating defendant in the stabbing. However, Couture had already testified that during the drive with Limoge, Sturtevant, and defendant's girlfriend, Couture did not disclose that defendant had committed the crime. Defendant's girlfriend had testified that the first inkling she got that defendant was involved in the crime was after the drive when Limoge told her that it was defendant. The excluded testimony arguably suggested that shortly after the various group members completed their police interviews, they conferred with one another, and Limoge called the police and told a bald lie in the process of implicating defendant for the first time. This evidence could have reinforced the defense theory that the plan to implicate defendant was concocted by the group of friends and orchestrated by Limoge, after they gave their initial interviews to the police.

¶ 93. The majority rightly points out that defense counsel set up this theory, including highlighting Limoge's untruthfulness when he called the police to identify defendant as the assailant, in the opening argument, and in cross-examining Couture and defendant's girlfriend. But without the excluded testimony to actually close the loop from the opening statement and cross-examination, establishing as a matter of evidence that Limoge was untruthful in his initial report to the police, the opening statement and cross-examination were, at best, loose ends that were never tied up by actual evidence.

¶ 94. The force of this potential evidence is not strong; Limoge himself did not testify, so he offered no testimony to be impeached. But the evidence indirectly impeached Couture, defendant's girlfriend, and arguably Yuric in that Limoge's lie potentially reinforced the defense theory that the entire group collaborated to implicate defendant. It's a theory that is bolstered by other evidence—including evidence that none of the witnesses implicated defendant in their initial interviews, Yuric did not recall that it was defendant and not Limoge who went after the victim until a year later, and defendant was a social outsider to the rest of the group.

38

¶ 95.    In the context of a case with significant weaknesses that depends almost entirely on the credibility of the very witnesses whose testimony the defense sought to impeach, I cannot conclude beyond a reasonable doubt that the erroneously excluded testimony would not have impacted the jury's verdict.

¶ 96.    I am hereby authorized to state that Justice Skoglund joins this dissent.

_____

Associate Justice